**NEW YORK STATE NATIONAL ORGANIZATION FOR WOMEN, et al., on behalf of themselves, their members, and all others similarly situated, and Clarice Seegars, Jane Doe, Dellie Britt and Bernadette Thomas, on behalf of themselves, and all others similarly situated, Plaintiff–Intervenors,**

v.

**Mario CUOMO, individually and as former Governor of the State of New York, Margarita Rosa, individually and as former Commissioner of the Division of Human Rights of the Executive Department of New York State, George Pataki, individually and as Governor of the State of New York, and Edward Mercado, individually and as Commissioner of the Division of Human Rights of the Executive Department of New York State, Defendants.**

No. 93 Civ. 7146(RLC).

United States District Court,
S.D. New York.

April 3, 1998.

Raff & Becker, L.L.P., David Raff, Robert L. Becker, of Counsel, New York City, for Plaintiffs.

Greater Upstate Law Project, Steven L. Brown, Robert F. Graziano, of Counsel, Rochester, NY, for Plaintiffs.

Law Offices of Allison Berry, Allison Berry, of Counsel, White Plains, NY, for Plaintiffs.

Law Offices of Gerald J. Dunbar, Gerald J. Dunbar, of Counsel, Brooklyn, NY, for Plaintiffs.

Attorney General of State of New York, Dennis Vacco, June Duffy, of Counsel, New York City, for Defendants.

## OPINION

ROBERT L. CARTER, District Judge.

This action arises out of alleged constitutional violations committed by the New York State Division of Human Rights ("SDHR" or the "Division") through its failure to process discrimination complaints in a timely manner. Plaintiffs, including members of the New York State National Organization for Women ("NOW"), and individual plaintiff-intervenors, now move to amend their complaint[1] pursuant to Rule 15(a), F.R.Civ.P., to add additional parties in their individual capacities and to create an additional subclass of plaintiffs.[2]

NOW separately argues that new intake procedures promulgated by SDHR in November 1995 impermissibly restrict the filing of complaints and are unconstitutional. NOW seeks to supplement its complaint pursuant to Rule 15(d), F.R.Civ.P., by adding various constitutional claims against the Division related to its new intake procedures and by adding the Division's Commissioner as a party in his personal capacity for promulgating these procedures. NOW further seeks a

preliminary injunction enjoining the Commissioner from enforcing portions of the new procedures.

## I. Background

In their original intervenor complaint filed in August 1994, plaintiffs alleged that SDHR's inordinate delay in processing discrimination complaints deprived the complainants of their due process and equal protection rights. According to the complaint, New York Executive Law § 297 (the "Human Rights Law") provides an administrative process for resolving complaints of discriminatory practices within specific time periods. Plaintiffs asserted that SDHR failed to adhere to these time limitations, as a consequence of which: complainants were unable to obtain needed evidence, could not provide accurate testimony, could no longer locate witnesses, or had awards reduced or cases dismissed in state court. In addition, the Division's caseload became severely backlogged, compounding its inability to process outstanding complaints.

In his Report and Recommendation, dated May 19, 1995 (the "Initial Report"), Magistrate Judge James C. Francis, IV found that plaintiffs had sufficiently established that the Human Rights Law creates an entitlement to have discrimination complaints heard without prejudicial delay, thereby providing complainants with a property right protected by the Fourteenth Amendment. (Initial Report at 45). The Initial Report further recommended the substitution of Edward Mercado, Commissioner of SDHR, and Governor George Pataki as defendants in their official capacity to the extent that their predecessors, Margarita Rosa and Mario Cuomo, respectively, were sued in their official capacity. (Id. at 30–35). Upon motion of NOW and individual plaintiff-intervenors, a class was provisionally certified, as follows:

of all persons who have filed or will file complaints of discrimination with SDHR

---

1. The individual plaintiff-intervenors filed separate claims but seek to amend the complaint on the same grounds as NOW. Therefore, except where otherwise noted, the claims will be treated as one.

2. Defendants cross-moved to dismiss one of the individual plaintiff-intervenors but the motion was denied by Magistrate Judge James C. Francis, IV. Defendants do not contest this denial. (Defs.' Objs. at 2, fn. 1).

and whose complaints have not been finally administratively adjudicated or otherwise resolved within three years of the date of the filing of the complaint.

This class includes, but is not limited to, two subclasses as follows:

(a) all persons who have been, are or may be subject to dismissal of their complaints because defendant Margarita Rosa, SDHR Commissioner, has taken longer than three years from the date the complaint was filed to finally resolve the complaint; and

(b) all persons who have been, are or may be subject to a reduction in the monetary relief awarded, either by order of Commissioner Rosa or by court order, because it has taken longer than three years from the date the complaint was filed to render a final administrative determination.

(Id. at 53).

Plaintiffs subsequently moved to amend and supplement the complaint based upon recent events and discovery that has occurred since the Initial Report. According to NOW, Commissioner Mercado and Governor Pataki know of the Division's substantial case backlog and are aware of the alleged constitutional violations resulting therefrom, yet have failed to remedy this problem. Furthermore, NOW claims that the SDHR has attempted to reduce its case backlog under the Pataki administration's and Commissioner Mercado's auspices by 1) promulgating and implementing new Rules of Practice ("Rules") that prevent certain individuals from filing discrimination complaints that are otherwise permitted to be filed under the Human Rights Law,[3] and 2) dismissing hundreds of complaints per year on the grounds of "administrative convenience," i.e., where

the Division has taken so long to contact the complainant that it either cannot locate the complainant or determines that the complainant is uncooperative.[4]

Plaintiffs now seek leave to amend the complaint to add claims against the Governor and the Commissioner in their personal capacities (they are already defendants in their official capacities) because of their alleged failure to take reasonable steps since January 1995, to effectively and fairly reduce the Division's case backlog. Plaintiffs also seek leave to amend to add a third subclass to the definition of the provisionally certified class, namely, complainants whose complaints have been dismissed for administrative convenience. NOW separately seeks to supplement the complaint to add claims against Commissioner Mercado, in his personal capacity, and with respect to seeking injunctive relief against the Commissioner to prevent his implementation of those portions of the current Rules (9 N.Y.C.R.R. §§ 465.1(1) and 465.3(c)(6)) that relate to the filing and acceptance of a discrimination complaint with SDHR.

After conducting a hearing on these matters, Magistrate Judge Francis issued a Report and Recommendation, dated June 17, 1997 (the "Report"), in which he concluded that plaintiffs should be granted leave to amend their complaint to add the Governor and the Commissioner in their individual capacities. The magistrate judge determined that defendants had failed to demonstrate that plaintiffs' delay in bringing the motion was unreasonable, in bad faith, or prejudicial to defendants. (Report at 9, 10). In addition, the magistrate judge relied on his earlier reasoning in the Initial Report which found that, since the Governor and Commis-

---

**3.** Under the old Rules, SDHR was required to investigate all complaints within its jurisdiction and within the one-year statute of limitations. (Tr. at 206). The new Rules require that a complaint contain "information sufficient to indicate that the individual or organization filing such verified document has been aggrieved by an unlawful discriminatory practice and has actual knowledge of the facts alleged." 9 N.Y.C.R.R. § 465.1(1). In addition, the Division need not accept a complaint if it is based on "mere speculation," "contradicts an inference of discrimina-

tion," or is "totally unbelievable on its face." 9 N.Y.C.R.R. § 465.3(c)(6).

**4.** SDHR's definition of "administrative convenience" apparently encompasses a larger range of meanings than NOW targeted in its complaint. In accordance with the meaning used by plaintiffs in their motions, this opinion will use the narrow characterization of an "administrative convenience" dismissal as an instance in which SDHR could not locate the complainant or deemed the complainant uncooperative.

sioner have the power to direct policy at SDHR:

> if the Governor and Commissioner knew of the alleged constitutional violations described in the original complaint but failed to remedy them properly, they can be held liable in their individual capacities, regardless of their financial control over SDHR.

(Initial Report at 11, 12).

The Report also recommended that plaintiffs be allowed to add a third subclass to the definition of the provisionally certified class, concluding that NOW had sufficient standing to adequately represent the proposed subclass regardless of whether a specific plaintiff-intervenor is a member of the proposed subclass. (Id. at 12, 13). Quoting the Initial Report, Magistrate Judge Francis found that:

> [I]t is sufficient [for purposes of representational standing] for NOW to allege that its members' property rights are threatened by the SDHR's purported inability to process claims properly." (Initial Report at 24). Therefore, NOW has standing to assert claims on behalf of those complainants subject to administrative convenience dismissals.

(Report at 12, 13).

The Report further recommended that NOW's motion seeking to supplement its complaint be granted to add claims against the Commissioner in his personal capacity for implementing the new intake procedures. The magistrate judge found that this claim "relate[d] to the issues raised in the original pleading," and that defendants had not demonstrated that the claim would "require the [defendants] to: (i) expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the [party] from bringing a timely action in another jurisdiction." (Id. at 19, 20, citing *Block v. First Blood Assoc.,* 988 F.2d 344, 350 (2d Cir.1993)). The magistrate judge concluded that the Commissioner [5] should be enjoined during the pendency of this action from using the new Rules as a basis for

making any determinations in processing discrimination claims. (Report at 43).

Defendants filed limited objections to the Report pursuant to Rule 72, F.R.Civ.P., charging that the proposed amendments are futile and improperly substantiated, and that the amendments will only delay the course of this litigation and prejudice the defendants. Plaintiffs' reply memorandum of law rejects defendants arguments in full.

Subsequent to filing a reply to defendants' objections to the Magistrate Judge Francis' recommendations, NOW filed a motion pursuant to Rule 65(a)(2), F.R.Civ.P., for an order 1) consolidating the proceeding on NOW's preliminary injunction motion with a trial on the merits, and converting the magistrate judge's recommendation to grant the preliminary injunction into a permanent injunction enjoining defendant Mercado, and all persons in active concert with him, from implementing the new Rules, 2) providing notice to defendant Mercado of the court's intention to consolidate and convert the proceeding and offering him the opportunity to submit an offer of proof in support of any contention that he might make that there are additional facts which would, if heard by the court, result in a different result, and 3) granting NOW 30 days, from the date of the court's decision to enter a permanent injunction, to submit a proposed order providing remedial relief to all persons claiming to be aggrieved by unlawful discriminatory practices who attempted to file a complaint at the Division and whose complaint, or efforts to file a complaint, were rejected by the Division since November 5, 1995.

## II. Analysis

When a magistrate judge enters into the record a recommendation for disposition of a matter, a district court is required to make "a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made in accordance with this rule." Rule 72,

---

**5.** The Report identified the Division as the entity to be enjoined, rather than the Commissioner, but the Commissioner is the named party, not the Division. Accordingly, the court interprets the magistrate judge's recommendation for injunction to apply to the Commissioner.

F.R.Civ.P. The district judge "may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate with instructions." Rule 72(b), F.R.Civ.P.

*A. Motion to Amend*

In the Report, the magistrate judge recommends granting plaintiffs' motion to amend the complaint to add Pataki and Mercado in their personal capacities and to add a third subclass. The proposed sub-class is defined as:

> All persons who have been, are, or may be subject to administrative convenience dismissals because SDHR was either unable to locate complainants, or SDHR determined that the complaint had failed to cooperate and such complaints had been pending at SDHR from more than one year.

■ Leave to amend a motion "shall be freely given when justice so requires." Rule 15(a), F.R.Civ.P. Provided the claims are a proper subject for relief, a plaintiff ought to be afforded an opportunity to test his claims on the merits. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Thus, absent undue delay, bad faith, failure to cure deficiencies by amendments previously allowed, futility of the amendment or undue prejudice to the opposing party in allowing the amendment, leave to amend should be granted. *Id.*

■ Defendants do not allege that the motion to amend the complaint is legally frivolous or that granting it would result in unjustified delay or undue prejudice. Instead, in an attempt to refute plaintiffs' claim that the Governor and Commissioner stood idle as SDHR's caseload languished, defendants argue that plaintiff's motion cannot stand in the face of evidence that the SDHR's case backlog has been significantly reduced since January 1995. (Defs.' Objs. at 10–12). The defendants further allege that the Governor and Commissioner reduced the backlog without recourse to the new Rules. (Id.). These arguments, however, go to the merits of the

defendants' case and are inadequate to prevent a motion to amend. *See Madison Fund, Inc. v. Denison Mines Ltd.,* 90 F.R.D. 89, 91 (S.D.N.Y.1981) (Duffy, J.) (holding that considering an amendment is not the time to address the merits of a case).

Defendants also argue that NOW cannot represent the proposed subclass on the grounds that NOW should be restricted to representing female plaintiffs; that some complainants that fall within the proposed subclass had complaints dismissed before Pataki and Mercado were in office; and that some of the administrative convenience dismissals ("ACDs") were the result of the complainants not staying in contact with the SDHR. (Defs.' Objs. at 12–15). Defendants further fault the magistrate judge for not ruling on the individual plaintiff-intervenors' ability to represent the interest of the proposed subclass, claiming that no individual plaintiff-intervenor could adequately represent the subclass. (Id.)

■ The court finds that defendants waived their right to object to NOW's ability to represent men in the proposed subclass when defendants failed to contest the magistrate judge's Initial Report which found NOW capable of being a class representative for men and women (though it could only sue for women). (Initial Report at 26, 27). Such inaction constitutes a waiver of further objection in regards to this issue. *See Small v. Secretary of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that "failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"). The court's decision may not be changed or altered absent compelling or cogent reasons. *Baden v. Koch,* 799 F.2d 825, 828 (2d Cir. 1986). Defendants proffered no such rationale.

Defendants' assertions that some ACDs occurred before Pataki or Mercado came into office are irrelevant. The affidavit of John Lind, deputy commissioner of SDHR, reveals that from April 1996 through February 1997, there were 434 ACDs.[6] This information

---

**6.** 129 of these 434 ACDs allegedly were due to the Division's failure to locate complainants or

for claimed lack of cooperation. (Pl.–Ints.' Reply Mem. at 15, fn. 11).

adequately supports not only the approval of the proposed third subclass, but also plaintiffs' allegations of personal liability against the Governor and Commissioner. The fact that some ACDs took place under Pataki and Mercado's watch allows such dismissals to be "laid at the door of the Governor and the Commissioner." (Defs.' Objs. at 13). Whether these dismissals offend constitutional principles and whether any fault lies with complainants for breaking contact with SDHR are issues that go to the merits of the case and will be decided at trial.

The court also agrees with the magistrate judge's finding that NOW's standing to assert claims on behalf of the proposed third subclass obviates the need for the individual plaintiff-intervenors to be members of the subclass. (Report at 13, fn. 6). Even if such membership were required, the record indicates that individually named plaintiffs can adequately represent the proposed third subclass. The proposed subclass includes those persons who "may be subject to administrative convenience dismissals because SDHR was . . . . unable to locate complainants . . . . and such complaints had been pending at SDHR from more than one year." Two individually named plaintiffs, Dellie Britt and Clarice Seegars, have had cases pending with the SDHR for more than one year and may be subject to ACD determinations.[7] Thus, Britt and Seegars are representative of the proposed subclass. Accordingly, the magistrate judge's recommendation to grant plaintiffs' motion to amend the complaint to add Pataki and Mercado in their personal capacities and to add a third subclass is affirmed and adopted as the judgment of this court.

## B. Motion to Supplement

The Report recommends granting NOW's motion to supplement its complaint by holding Mercado liable in his personal capacity

for the promulgation of the new Rules and by adding due process, equal protection, Supremacy Clause, and void for vagueness claims arising out of the Division's implementation of the new Rules.

■ As with Rule 15(a), F.R.Civ.P., a court has discretion to grant or deny a Rule 15(d) motion, *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 66 (2d Cir.1995), in order to better foster "a full adjudication of the merits of the parties' disputes within a single comprehensive proceeding." *Katzman v. Sessions,* 156 F.R.D. 35, 38 (E.D.N.Y.1994). The standard for the exercise of discretion on a motion to supplement the pleadings is the same as that for disposition of a motion to amend a complaint under Rule 15(a), F.R.Civ.P. *Id.*

Defendants argue that NOW's motion must be denied as barred by the Eleventh Amendment and the principles of comity and federalism.[8] Defendants argue primarily that the Eleventh Amendment protects Mercado from any finding of liability for promulgating new rules when acting in his official capacity under state law. (Defs.' Objs. at 15, 16). Defendants also claim that allowing NOW to bring a separate claim on behalf of the entire class would result in the bifurcation of claims and would be confusing and prejudicial to defendants. (Id. at 18, 19).

■ The magistrate judge already ruled on the Eleventh Amendment arguments now raised by defendants in his Initial Report when he found that state actors could be sued in their individual capacities if they have personal involvement and actual or constructive knowledge of the alleged constitutional violations (Initial Report at 39–40). The case law cited by defendants, *Farid v. Smith,* 850 F.2d 917 (2d Cir.1988), is, in fact, the very case law cited by the magistrate judge in his Report that recommends granting NOW's motion. The court in *Farid* held

---

**7.** Indeed, Britt allegedly was already threatened with case dismissal because the Division claimed it had been unable to locate him. *See* Reply Affirmation of Robert F. Graziano dated March 25, 1997, Exhibit "A".

**8.** Defendants also argue that the individual plaintiff-intervenors lack standing to challenge rules because their complaints were accepted under

the former Rules. (Defs.' Objs. at 18, fn. 7). However, the individual plaintiff-intervenors' standing is a non-issue at this juncture since only NOW is seeking to supplement its complaint by adding Mercado in his personal capacity. Defendants additional arguments questioning the ability of NOW to perform as a class representative have already been addressed *supra* II.A.

that "[t]he Eleventh Amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from his personal liability if he is sued in his 'individual' or 'personal' capacity." 850 F.2d at 921. Moreover, the Second Circuit held in *Farid* that even if a state official "was merely carrying out a policy of the state, he would not be protected from personal liability under the 11th Amendment." *Id.* Thus, defendants' argument that Mercado was merely following the state legislature's orders is misplaced. State officials can be individually liable if they have direct power to control policies, *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065–66 (2d Cir.1989), and if they have actual or constructive knowledge of alleged constitutional violations. *Santiago v. Miles,* 774 F.Supp. 775, 791–92 (W.D.N.Y. 1991). As Commissioner of SDHR, Mercado had direct oversight of the implementation of the policies. Furthermore, he and his agency were put on notice of the alleged constitutional violations by the instant law suit which was instituted prior to Mercado's appointment. Therefore, plaintiffs may sue Commissioner Mercado in his personal capacity.

■ The fact that NOW is the only plaintiff seeking to supplement its complaint does not present a confusing melange of claims as the defendants suggest. Indeed, defendants fail to present any evidence or showing that allowing NOW to proceed on these claims would unduly confuse or prejudice these proceedings. On the contrary, the proposed supplemental claims concerning the new Rules are related to the original claim of undue delay in evaluating new cases, especially considering that the Rules were changed specifically to reduce the agency's case backlog. (Report at 18). Accordingly, Magistrate Judge Francis' recommendation to allow plaintiffs' motion to supplement the complaint is affirmed and adopted as the judgment of this court.

## C.  *Motion to Enjoin*

The Report recommends granting NOW's motion to enjoin Commissioner Mercado from implementing the new Rules as they apply to accepting discrimination complaints. In reaching this decision, Magistrate Judge

Francis first held NOW to the highest standard for the imposition of a mandatory preliminary injunction: a likelihood of success on the merits and proof of irreparable harm in the absence of such an injunction. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). Neither defendants nor NOW contest the applicability of this standard.

The magistrate judge then evaluated NOW's probability of success on its claim under the balancing test set forth by the Supreme Court in *Mathews v. Eldrige,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In *Mathews,* the Court held that the three factors used to determine the constitutionality of government administrative procedures are 1) the private interest that will be affected by the official action, 2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and 3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement could entail. *Id.* Applying the *Mathews* principles, Magistrate Judge Francis found that plaintiffs possessed a "substantial" likelihood of success based on his findings that 1) the ability to file a complaint with SDHR is a type of property interest protected by the Due Process Clause of the 14th Amendment, 2) the new Rules of Practice are ambiguously defined and randomly applied, thereby creating a significant risk that valid discrimination claims will be rejected by the SDHR, and 3) the Division failed to articulate any fiscal or administrative burden that would attend implementing substitute intake procedures. (Report at 37).

■ Based on witnesses' testimony, Magistrate Judge Francis also found that the arbitrary denial of discrimination complaints irreparably harms the putative complainants, since they are unable to secure the protection of the Human Rights Law and are unlikely to pursue other available remedies. (Report at 40). In particular, Sheila Akabas, a professor at the Columbia University Graduate School of Social Work, and Karen

Wagner, a senior extension associate at the Cornell University School of Industrial and Labor Relations, both testified that individuals whose complaints have been declined by a government agency will most likely not pursue their complaints elsewhere. (Tr. at 77–78, 141–142). The magistrate judge found that complainants who did refile their complaints faced the barriers of statutes of limitations, the increasing difficulty in obtaining evidence as time passes, and the retarding of efforts to obtain some forms of relief such as reinstatement to employment. (Report at 41). Finally, Magistrate Judge Francis relied on evidence adduced at the hearing that complaints of discrimination in violation of federal law which are rejected by the Division are in jeopardy of not being channeled to the Equal Employment Opportunity Commission ("EEOC") since some SDHR employees 1) discourage complainants from pursuing federal claims, 2) fail to adequately inform complainants of the EEOC's potential for filing complaints, and 3) fail to refer putative complainants to the EEOC altogether. (Record at 42). Thus, Magistrate Judge Francis concluded that SDHR's continued use of the new Rules risks inflicting irreparable harm on potential complainants by depriving them of their due process right to have their discrimination claims properly investigated. *See Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir.1992) (alleged possible deprivation of a constitutional right constitutes irreparable harm for purposes of a preliminary injunction) (citing *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984)). Since he also found substantial likelihood that NOW will succeed on the merits of its due process claim, the magistrate judge recommended granting the preliminary injunction to prevent the implementation of the new Rules in SDHR's complaint processing procedures.[9]

Defendants first object to the magistrate judge's reliance on the testimony of Akabas

and Wagner in making his recommendations. Although defendants do not contest Wagner's and Akabas' credentials as experts on the substantive issue of sex discrimination,[10] defendants claim that, because of their limited direct knowledge of individuals who have attempted to file a complaint with the Division and been turned away, Akabas' and Wagner's testimony is not dispositive and should be discounted. (Defs.' Brief at 19, 22).

The Federal Rules of Evidence permit opinion testimony by experts when the witness is "qualified as an expert by knowledge, skill, experience, training, or education," and "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine the fact in issue." Rule 702, Fed.R.Evid. Both Wagner and Akabas clearly are qualified experts in their fields and their testimony was adequately geared towards assisting the trier of fact reach a conclusion about the level of harm inflicted by SDHR's initial rejection of a complaint. Defendants challenge the testimony in question, however, by arguing that Akabas and Wagner are not qualified "to speak to the issue of the adequacy of the new intake procedure" (Defs.' Objs. at 19, 20), in violation of Rule 703, Fed.R.Evid., which delimits the bases upon which an expert may rely in testifying to those "reasonably relied upon by experts in the field." Defendants' objections stem from the fact that Wagner did not interview any individual who failed to pursue other remedies after having his complaint rejected by SDHR under the new Rules and Akabas knew of only one such person. (Tr. at 148).

If Wagner and Akabas were testifying directly to the adequacy of the intake procedures, Rule 703 could very well prevent their testimony from being heard by the trier of fact. However, they each testified only to the likelihood that a person whose complaint has been rejected would pursue his complaint elsewhere. In that regard, both Wagner and

9. Since Magistrate Judge Francis found a preliminary injunction warranted on the basis of due process, the court did not address the question of whether a preliminary injunction should issue on the basis of NOW's equal protection and Supremacy Clause claims.

10. Both Wagner and Akabas have received significant schooling in this area, published numerous articles on the subject of discrimination in the workplace, and conducted extensive training programs for students, employers, unions, and public agencies. (*See* Wagner: Tr. 61–73; Akabas: Tr. 125–37).

Akabas have ample experience with labor disputes involving alleged discrimination and the tensions involved in pursuing discrimination claims. For example, Akabas testified in the following manner:

Q: How would you describe the mental and emotional state of someone who believes that they have been subjected to unlawful discrimination?

A: Well, there's a range of responses, but my experience is that most of the time people feel helpless. They feel that there are [sic] not much in the way of supports for them. They feel victimized. They feel that the possibility of reversing the experience is small. And they feel that way based on prior experience where they have had similar experiences or having observed other people who have had similar experiences.

. . .

Q: Let's assume that a person believes that he or she is a victim of discrimination in the workplace and does come forward to make that discrimination complaint. Let's further assume that an employee of a government agency rejects that complaint, doesn't let it be filed. What is your opinion of the likelihood of that person pursuing the complaint any further:

. . .

A: I would say that some might have gotten enough energy together that they could proceed afterward, but the vast majority would have reconfirmation of their expectation that no one's going to listen, and I'm just going to have to live with this—a repeat of the learned helplessness of victims.

(Tr. at 138, 141–142).

Wagner's testimony included:

Q: . . . Let's assume that a woman believes that she is the victim of discrimination in the workplace, and she does come forward to make a discrimination complaint to a government agency. Let's further assume that an employee of that agency tells the woman that the agency will not accept the complaint. What is your opinion of the likelihood of that woman pursuing the complaint any further?

A: There's a high unlikelihood that she would pursue that complaint further.

Q: That is a high unlikely [sic] that she would pursue it?

A: It is unlikely that she would pursue that complaint further.

Q: What is the basis for that opinion?

A: A number of reasons form the basis of that opinion.

In the general training and education that I did in my role at Working Woman's Institute in working with individuals who were the target of behavior they perceived to be harassing, many of them were poor or working class women, or even middle class women who did not have the money to seek other legal representation, and so they relied on a government agency whose mission they understood was to protect and to address issues of discrimination. And so the lack of economic resources would be one strong factor that would discourage women from pursuing this.

For poor, working class, and immigrant women, their access to any other information about what other options exist is also limited by their lack of economic resources, and so they would see that as their only avenue of redress, and if that was shut off to them, then they would see that they had no avenue of redress.

(Tr. 77–78).

Wagner further testified on cross-examination that her "opinion here today is based on [her] experience in counseling women and in working with women and in understanding the literature." (Tr. at 81).

Akabas' and Wagner's testimony about the effects of discrimination sufficiently supports the magistrate judge's opinion that complainants, once rejected by SDHR, most likely will

not seek redress elsewhere. Therefore, based on their testimony and on their credentials, Wagner's and Akabas' opinions as to the effects of the governments' initial rejection of discrimination complaints are not "pure speculation" as averred by defendants and their testimony is not excludable under either Rule 702 or 703, Fed.R.Evid.

Defendants also object to testimony concerning the impact of SDHR's new Rules given by Lois Shapiro–Canter, President of New York State NOW. Defendants characterize Shapiro–Canter's testimony as "ineffective" since she "was not familiar with any changes in procedure.... [and] did not know of any person with putative claims of discrimination referred by NOW personnel to the Division whose complaints were not accepted by the Division under the new Rules." (Defs.' Objs. at 23). However, Shapiro–Canter was not presented as an expert witness and the magistrate judge was free to give as much credence to her testimony as he felt it warranted. Therefore, defendant's objection to her testimony is unfounded.

■ Defendants next argue that the discretion exercised by the Division's employees under the new Rules of Practice is justified because it protects against "vexatious and unnecessary governmental investigation." (Defs.' Objs. at 24). Under the new Rules, Division intake personnel may reject complaints which are based on "mere speculation," or are contradictory, "totally unbelievable," or jurisdictionally insufficient. (Report at 26). Supervisors review any decision to decline complaints before the rejection becomes official. Defendants argue that the protection of SDHR's resources that this review system provides "should be sufficient to prevent the Division's new intake procedures from being struck down by the federal court." (Defs.' Objs. at 24).

Identifying and dismissing frivolous complaints are justifiable and desirable goals. SDHR does not have limitless resources and even plaintiffs' witnesses admit that not all claims have merit (Tr. at 82, 152). However, the primary issue facing the court is whether SDHR's methods of separating "vexatious" claims from valid ones are constitutional. Ample evidence in the record suggests that

New York's government, in its rush to cleanse the Division's backlog of cases and prevent wasteful investigations, has instituted ambiguous policies that are erratically applied and that unduly risk erroneous determinations in the intake process.

For example, Lind testified that the Division had "some difficulties in consistency across the state" when applying the standard operating procedures for accepting complaints. (Tr. at 221). In monitoring the nine regional offices and two special units (Tr. at 270), Lind found that "[t]here were inconsistencies in language and in approach." (Tr. at 221). As Magistrate Judge Francis noted, the following exchange highlights the new Rules lack of clarity:

Q:   ... Now, Mr. Lind, do the new rules or revised rules of practice now define the term complaint as requiring that a complainant have, quote, actual knowledge, unquote, of the facts being alleged?

A:   Um hmm.

Q:   Okay. And what do the regs mean by actual knowledge?

A:   Well, I mean, I think it means what the words say, that they have actual knowledge.

Q:   Well, would you tell me what your understanding of actual knowledge as used in the regs is?

A:   That they have knowledge that the discrimination complained of—they have actual knowledge of the discrimination complained of. I could answer that, I suppose, in the other way, to say that when someone has no facts to support—other than that they are a member of a protected class and that something has happened to them, but they have no other knowledge, that that is what that is intended to get at.

Q:   Okay. Let me give you an example, and then let's see whether this meets the definition of a complaint or not. A woman comes to the State Division and contends or explains that although she was pro-

moted along with a male colleague, she did not get a raise and he did, but she bases that statement that the male colleague received a raise on information that was told to her by a co-worker. Would that meet the standard of actual knowledge?

A: Sure.

Q: ... Would you agree with me that she doesn't have firsthand knowledge of the fact that the male co-worker received a raise?

A: Correct.

Q: ... Okay. Would you tell me, then, what in the regulation defining complaint tells an intake worker that in this case the complainant had actual knowledge of a critical element.

A: There's nothing in the—I mean, again it is a definition. I mean, it doesn't tell you—it defines something. You know the assumption is that we have people capable of applying the definition.

Q: Well, if the definition doesn't give advice or direction or guidance in this case, how do these people who have to apply the regulation and the definition know whether the facts that I've just related to you constitute actual knowledge or not?

A: Well, they have knowledge of the law. They have knowledge of the rules. They have their experience. And they have a review by a supervisor.

. . .

Q: Have intake workers been given any more detailed instructions, written instructions, on the definition of actual knowledge as contained in the definition of complaint?

A: Written instructions? No.

The disturbing results of SDHR's new Rules were described by witnesses who testified at the hearing that their discrimination complaints were mishandled or unfairly rejected by SDHR. For example, Veronica Starr was terminated as a legal secretary after extended absences due to her pregnancy. Her SDHR complaint was denied, according to an internal SDHR form, because her employer was within its rights to fill her position for reasons of business necessity. (Tr. at 24–25, 39). The SDHR interviewer further told Starr that she had exceeded the number of days absent from work that she was permitted to take pursuant to the Family Medical Leave Act ("FMLA") and that her employer was not covered by the Human Rights Law because it employed too few people. (Tr. at 24, 25). The magistrate judge found the interviewer's analysis of Starr's case to be wholly incorrect. He first noted discrepancies in the record as to whether the Division considered part-time employees to be employees for purposes of establishing SDHR jurisdiction over an employer. (Report at 33). Magistrate Judge Francis also noted Lind's testimony that Starr's use of FMLA leave time was not a factor contradicting an inference of discrimination. (Tr. at 267). Even more troubling, the SDHR "interviewer accepted the employer's assertion that it had to replace Ms. Starr for business purposes, and treated such information as contradicting the clear inference of discrimination in that case" instead of investigating the veracity of the employer's statement. (Record at 33, 34).

The testimony of Starr and other witnesses significantly undercuts defendants' arguments that the SDHR is streamlining the complaint intake process in a fair and efficient manner. In reality, SDHR's intake personnel, most of whom are not lawyers (Tr. at 254), are assigned with the task of making snap judgements regarding a complaint's viability without clearly articulated guidance and under the pressure of thousands of cases waiting to be decided. A review by one supervisor facing the same pressures cannot serve to correct a seriously flawed process.

Lastly, defendants fault the Report for not subscribing to Lind's view that requiring the acceptance of a complaint already accepted by the EEOC would result in "an administrative nightmare." (Defs.' Objs. at 25). However, in evaluating the state interest in maintaining the new Rules, Magistrate Judge Francis found that the defendants "do not

explain why it would be administratively burdensome for the division to accept [complaints already filed with the EEOC] and then simply defer the investigations until either the EEOC completed its investigations or referred the complaints to SDHR." (Report at 35). The magistrate judge was also disturbed that "nothing in the Human Rights Law, the new Rules of Practice, or the Worksharing Agreement [with the EEOC] authorizes the Division to decline a complaint simply because the individual has already filed a complaint with the EEOC." (Report at 36).

In their objections, defendants proffer Lind's testimony indicating that complaints filed with the EEOC eventually do reach SDHR under work-share agreements with EEOC. (Tr. at 227). Nevertheless, neither Kulwant Singh nor Paul Grant, two witnesses whose complaints were rejected by SDHR because of EEOC involvement, were ever informed that their complaints could be registered with EEOC and later deferred to SDHR. Furthermore, Division intake personnel discouraged Claudette Maynard, another complainant, from seeking help from the EEOC. (Tr. at 52–53). In other words, complainants who are rejected by SDHR also risk forgoing their federal civil rights claims. Therefore, defendants' "administrative nightmare" argument fails in the face of the constitutional nightmare experienced by complainants who have avenues of redress denied or obstructed.

In light of the record, the court agrees with the magistrate judge that, as it currently stands, SDHR's complaint intake policy arbitrarily prevents aggrieved individuals from filing discrimination complaints with SDHR. As the Supreme Court held in *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434–35, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), "[a] system or procedure that deprives persons of their claims in a random manner ... necessarily presents an unjustifiably high risk that meritorious claims will be terminated." Moreover, the alternative means of redress suggested by Lind, namely, consulting an attorney and suing in state court (Tr. at 245), are not always available to discrimination victims who are unfamiliar with the legal system or unable to afford legal counsel. In sum, the record demonstrates that NOW is likely to succeed on the merits of its claim and that complainants will suffer irreparable harm in the absence of preliminary injunctive relief. Accordingly, Magistrate Judge Francis' recommendation to issue a preliminary injunction enjoining Commissioner Mercado from utilizing the new Rules in SDHR's complaint intake process during the pendency of this action is affirmed and adopted as the judgment of this court.

### III.   Conclusion

For the reasons stated above, plaintiffs' motion to amend their complaint is granted. NOW's motions to supplement its complaint and for a preliminary injunction are also granted.

A full bench trial on the merits will be held beginning on June 8, 1998, at 11:30 AM. The parties should plan accordingly.

**IT IS SO ORDERED.**