**NEW YORK STATE NATIONAL ORGANIZATION FOR WOMEN, et al., on behalf of themselves and their members, and all others similarly situated, and Clarice Seegars, et al., on behalf of herself and all others similarly situated, Plaintiffs–Intervenors,**

v.

**George W. PATAKI, individually and as Governor of the State of New York and Edward Mercado, individually and as Commissioner of the Division of Human Rights of the Executive Department of New York State, Defendants.**

No. 93 Civ. 7146(RLC).

United States District Court,
S.D. New York.

Oct. 26, 1999.

Robert L. Becker, David Raff, Stephanie Davis, Phebe MacRae, Raff & Becker, New York, for Plaintiffs.

Steven L. Brown, The Greater Upstate Law Project # 660, Rochester, NY, for Plaintiffs.

Robert Graziano, Pace Law School, White Plains, NY, for Plaintiffs.

June Duffy, Mona Jha, Dennis C. Vacco, Attorney General of the State of New York, New York, for Defendants.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiffs–Intervenors ("plaintiffs") seek a declaratory judgment and injunctive relief based on alleged constitutional violations by defendants in the processing of discrimination complaints filed with the New York State Division of Human Rights (the "Division").

### I. Background

#### A. The Statute Involved

New York's Human Rights Law, promulgated in 1945, makes the right to obtain housing and employment free of discrimination a civil right. N.Y. Exec. Law § 126 (the "HRL"). The statute, pursuant to § 296, proscribes discrimination based on, *inter alia*, race, color, creed, national origin, gender, age, disability, pregnancy, in employment, housing, licensing, labor organization and apprentice training program membership, employment agency referrals, public accommodations, educational institutions, public services, and credit transactions. 18 N.Y. Exec. L. § 296.

The Division was established and empowered to hear, investigate, prosecute, and adjudicate claims of discrimination outlawed by the statute. Where such claims had been validated through the agency process, the Division was empowered, through its Commissioner, to provide vindicating remediation sufficient to make the claimant whole. 18 N.Y. Exec. L. § 297.

Manifesting concern that the Division establish a process that moved matters from initiation to conclusion with reasonable timeliness, specific time constraints were set forth in the statute, as follows: Once a claim of discrimination has been filed, the Division is required to promptly serve a copy on the respondent and to undertake a prompt investigation of the claim. 18 N.Y. Exec. L. § 297.2.a. The Division must decide within 180 days after the claim is filed whether there is probable cause to believe that the claim of discrimination is valid. (*Id.*) If the Division makes a probable cause determination, it must, within 270 days after the filing of the complaint, issue a notice requiring the respondent to answer and to appear at a public hearing. 18 N.Y. Exec. L. § 297.4.a. Within 180 days after commencement of a hearing, a decision and an order must be issued. 18 N.Y. Exec. L. § 297.4.c.

A Division attorney will prosecute all claims resulting in probable cause determinations. 18 N.Y. Exec. L. § 297.4.a.(i). The Division must ensure compliance with its remedial orders, and when compliance is not effectuated, it must seek to enforce the order within one year of its issuance. 18 N.Y. Exec. L. § 297.7. In evident recognition of the uniqueness of housing, the timetable for probable cause determinations with respect to housing discrimination was shortened from 180 to 100 days from the filing of the claim.

18 N.Y. Exec. L. § 297.2.b. The statute also explicitly declares that its provisions are to be construed liberally in order to accomplish the purposes of the HRL. 18 N.Y. Exec. L. § 300.

## B. The Parties and Relief Sought

Plaintiffs, consisting of various individuals and organizations, have instituted and intervened in this 42 U.S.C. § 1983 proceeding, which was brought as a class action pursuant to Rule 23, F.R. Civ. P., in order to challenge the administrative practices and procedures of the Division in its handling and processing of claims of discrimination. Plaintiffs allege that their Fourteenth Amendment rights to due process and equal protection have been infringed upon by the protracted administrative delays to which their claims have been subjected, and that the institution of certain intake rules (the "1995 Intake Rules"), pursuant to which the Division refused to accept complaints alleging illegal and unconstitutional discrimination, violates the Supremacy Clause.

Enforcement of the new intake rules was preliminarily enjoined by the court. Plaintiffs have moved for an order rendering the preliminary injunction permanent, which motion will be disposed of as part of the instant determination.

Plaintiff National Organization for Women, New York State, Inc., ("NOW"), is a membership organization incorporated in the State of New York, consisting of 24 chapters, with a total membership of 18,000 to 20,000. Plaintiff New York City Chapter of NOW, one of the 24 chapters, is located in New York City. Plaintiff Westchester County Chapter NOW is a chapter in the indicated county, with offices in White Plains, New York.

Plaintiff Clarice Seegers filed a complaint of race, gender, and disability-based discrimination against her employer with the Division on April 13, 1990. Her complaint did not get a public hearing until roughly seven years after it was filed, and the complaint was still pending at the time of trial.

Plaintiff Jane Doe is the administratrix of the estate of John Doe, who filed a disability discrimination complaint with the Division on August 29, 1990. John Doe, the main witness in the case, died in September, 1991, before any meaningful investigation had been commenced and before a probable cause determination had been made.

Plaintiff Bernadette Thomas initiated a charge of race discrimination against her employer with the United States Equal Employment Opportunity Commission ("EEOC"). The matter was referred to the Division on March 2, 1987. In January, 1996, Thomas requested and received an administrative convenience dismissal ("ACD") of her complaint in order to prosecute her claim in this court. At the time she requested and received the ACD, no probable cause determination had been made and no public hearing had been held or scheduled, despite the fact that her complaint had been pending before the Division for over eight years.

Plaintiff Dellie Britt filed his complaint of race discrimination against his employer with the Division on October 1, 1985. The complaint, as of the commencement of this litigation, was still pending in the Division without a final administrative determination.

Michael Campbell filed a complaint of housing discrimination in September, 1992. As of July, 1997, no hearing had been held and no determination had been made. In the interim, he had been diagnosed with an inoperable brain illness making death imminent, and, fearful that death would come before his complaint was heard, he settled his case in July, 1997.

The defendants include Margarita Rosa, Commissioner of the Division from 1990 to January, 1995. Rosa, prior to being named Commissioner, had served as Executive Deputy Commissioner and as General Counsel of the Division. As the chief executive officer of the Division from 1990 to 1995, Rosa had primary responsibility for administering the HRL.

Defendant Edward Mercado was Rosa's immediate successor. He took office as Commissioner in October, 1995, and, as such, had primary responsibility for administering the HRL from 1995 to the present.

Defendant Mario Cuomo was Governor of the State of New York from January 1, 1983, to December 31, 1994. As the state's chief executive, Governor Cuomo was responsible for management of all departments and agencies statutorily authorized and funded by the state during his twelve years in office.

Defendant George Pataki succeeded Governor Cuomo as Governor of the State of New York on January 1, 1995, and continues in that position at present. As such he has been responsible since January 1, 1995, for management of all departments and agencies funded by the State.

## II. History of the Litigation

This litigation was instituted as a class action on October 15, 1993, by Robert Louis Sanstrom. On July 24, 1995, Jane Doe, Bernadette Thomas, Dellie Britt, and Clarice Seegers were allowed to intervene as individual plaintiff-intervenors and NOW (New York State, New York City, and Westchester County Chapters) were allowed to intervene in a representational capacity.

### A. The Class Defined

The class action was provisionally defined as consisting of all persons who, since October 15, 1990, had filed or will file complaints of discrimination with the Division and whose complaints have not been, or will not be, finally administratively adjudicated or otherwise substantively resolved within three years of the date of the filing of the complaint. The provisional class was subsequently further defined to include three subclasses:

a) all persons who have been, are, or will be subject to dismissal of their complaints because defendants Rosa and Mercado have taken longer than three years from the date the complaint was filed to render a final determination (hereinafter "subclass A"); and

b) all persons who have been, are, or may be subject to a reduction in the monetary relief awarded, either by order of Rosa, Mercado, or by a court because defendants Rosa and Mercado have taken longer than three years from the date the complaint was filed

to render a final administrative determination (hereinafter "subclass B"); and

c) on April 3, 1998, a third subclass was added comprised of all persons who have been, are, or may be subject to ACD dismissals because the Division was either unable to locate complainants or had determined that the complainants had failed to cooperate and that their complaints had been pending for more than one year (hereinafter "subclass C").

On April 3, 1998, the class was allowed to amend the complaint to add claims against Governor Pataki and Commissioner Mercado in their personal capacities for permitting the delays in processing complaints before the Division. In addition, the class was also allowed to sue Mercado in his personal capacity for the institution and implementation of revised rules of practice relative to the Division's intake procedures.

NOW's application for preliminary injunctive relief was heard before Magistrate Judge James Francis IV on May 15, and May 20, 1997. On June 17, 1997, Judge Francis issued his Report and Recommendation proposing that the enforcement of the new intake procedures be preliminarily enjoined. In an opinion filed on April 3, 1998, the court accepted and adopted the Report and Recommendation as the order of the court. *See NOW v. Cuomo*, 182 F.R.D. 30 (S.D.N.Y. 1998) (Carter, J.) (hereinafter *"NOW I"*). The court was thereafter advised that Commissioner Mercado had immediately directed Division to cease using the new intake procedures and had begun the process of repealing them. (Tr. at 760.)

On July 16, 1997, plaintiffs moved to consolidate the proceedings on their motion for preliminary injunctive relief with the trial on the merits, thereby converting the preliminary injunction into a permanent injunction.

Defendants moved to dismiss plaintiffs' damages claims based on their claim of qualified immunity. That motion was granted in part and denied in part by an opinion and order entered on July 24, 1998. *See NOW v. Cuomo*, 14 F.Supp.2d 424 (S.D.N.Y.1998) (hereinafter *"NOW II"*). Appeal of the

court's *NOW II* ruling is pending before the Second Circuit.

By order dated August 4, 1998, the court bifurcated the proceedings, stayed the trial concerning defendants' individual liability for damages pending appeal of the court's NOW II ruling, and ordered trial to proceed only on plaintiffs' claims for declaratory and injunctive relief. The trial for declaratory and injunctive relief commenced on August 11, 1998, consumed seven trial days, and concluded on August 26, 1998. Post-trial briefs and memoranda were duly filed in November, 1998.

## B. The Administrative Proceedings

The Division is the agency established by the legislature to enforce the HRL. Its primary purpose is "to encourage programs designed to insure ... equal opportunity to participate fully in the economic, cultural and intellectual life of the state; to encourage and promote the development and execution by all persons within the state of such state programs; [and] to eliminate and prevent discrimination...." 18 N.Y. Exec. L. § 290. Its chief executive officer is the Commissioner, who is empowered to make policies and recommendations to aid the purposes of the HRL, to receive, investigate and pass on claims of discrimination, to initiate investigations and studies and file complaints to further the policies of the HRL, to create advisory councils, to develop human rights plans and issue publications to minimize or eliminate discrimination, to alleviate conflict among groups, and to provide technical assistance in furtherance of the HRL.

There are nine regional Division offices and two special offices—the Office of AIDS Discrimination Issues and the Office of Sexual Harassment Issues. (Tr. at 409–410). The chief executive of these regional offices is the Deputy Commissioner for Regional Affairs. The current Deputy is John Lind. (Tr. at 393). The regional offices receive complaints, conduct investigations, and issue probable cause determinations (*i.e.*, determinations that there is cause to believe that discrimination has occurred) and no probable cause determinations.

Complaints of discrimination are filed in the regional offices and are received by officials called Human Rights Specialists ("HRS") 1s and 11s. HRS 1s perform intake functions: they take complaints, look them over, advise complainants about how to proceed, and help get the complaint in proper form. Once a complaint is accepted, HRS 1s conduct an initial investigation. HRS 11s are supervisors: they review complaints to insure they meet the agency's requirements for processing, assist HRS 1s in developing their investigations, and aid in probable cause determinations. (Tr. at 703.)

Once a complaint is approved as being proper in form and substance, a copy is sent to the respondent with a request for a response and relevant documents. After the response is received, an HRS 11 reviews the file, drafts a preliminary investigation plan, and assigns an HRS 1 to undertake an investigation. (Tr. at 400). In the course of the investigation, the parties and witnesses are examined and relevant documents are requested and reviewed. (Tr. at 401). Sometimes a field trip to the site of the claimed infraction is made, and most frequently the parties are examined in a two party fact finding conference. (Tr. at 401–02). Whatever is done is written up as an investigation report. (*Id.*) An HRS 11 reviews the report and recommends a probable cause determination or a no probable cause determination. (Tr. at 402).

As the complaint proceeds through the various phases of the Division process, the Division continuously attempts to assist the parties in settling, conciliating or mediating their differences. (Tr. at 405–06, 765–66, 767–70). If the parties opt for mediation, the Division can contract the matter to a mediation agency or undertake the task itself. (Tr. at 767–70).

The report and recommendation of HRS 11s for a probable or no probable cause determination is sent to the Regional Director for review. If the probable cause recommendation is approved, the Director issues an order to that effect which is sent to the parties. (Tr. at 743). If the Regional Director's order is a no probable cause determination, the parties are informed of the

complainant's right to seek judicial review of that determination in the New York State Supreme Court within 60 days. (Tr. at 744, 747). On the expiration of the 60 day period, the file goes to the Division's central filing unit as a final determination, provided no appeal is taken. (Tr. at 403). If the complainant appeals within the 60 day period, the case then proceeds through the judicial process. If the case has also been filed with the EEOC, the complainant is advised of the right to seek EEOC review of the Division's no probable cause determination. (Tr. at 744, 747–49).

After a probable cause determination, the matter goes to the probable cause review unit which reviews the record to make certain it is in proper form and that it supports the probable cause finding. (Tr. at 408, 750–51). The unit may approve the determination, in which event the case leaves regional jurisdiction and goes to the hearing unit for calendaring. (Tr. at 408). It may also remand the case to the Regional Director or dismiss the complaint. (Tr. at 750–51).

Complaints are dismissed or remanded only if more information is deemed needed or if the law has been misapplied. (Tr. at 752). In the latter instance, the review unit may itself correct the error. (Tr. at 752–53). During the year prior to trial (i.e., 1997–98), only one complaint was dismissed by the unit and only five percent were remanded for additional information. (Tr. at 750–51).

The probable cause review unit does not normally review a no probable cause determination. There is no standardized or systematic review of these findings. The Deputy Commissioner testified that at his request the unit will look at a matter, but this occurs only on occasion (Tr. at 409), so that as a general rule a no probable cause determination constitutes a final Division order.

Once a case reaches the hearing unit, it is scheduled for a pre-hearing conference with an Administrative Law Judge ("ALJ") for settlement discussions only (Tr. at 260–61, 806); if settlement fails, the ALJ assigned to the case for settlement will not preside over the public hearing. (Id.) If the settlement conference does not succeed, a public hearing must be scheduled. The public hearing, however, is immediately preceded by a preliminary conference which is presided over by the ALJ who will conduct the public hearing. (Tr. at 261, 807). At the preliminary conference documents, witness lists, and the order of witnesses are agreed upon and exchanged, etc., and, if possible, the dates of the hearing are set. (Tr. at 262–63). The ALJ also decides pre-hearing motions to amend or dismiss the complaint, for summary judgment, and other such motions of substance or procedure. (Tr. at 822–23). At hearings, complainants are represented by Division counsel and/or private counsel (Tr. at 819), and respondents usually have their own counsel. (Tr. at 821).

Priority in scheduling for public hearings has been accorded to the oldest cases based on the date complaints were filed. However, the backlog is such that the chief ALJ simultaneously is seeking to calendar some of the newer cases while eliminating the backlog. (Tr. at 809). Division policy is to expedite AIDS cases for public hearing (Tr. at 277, 810), as well as those of complainants with other forms of terminal illnesses or who are of advanced age. (Id.)

At the conclusion of a hearing, the ALJ prepares a recommended order. (Tr. at 265). The case file, including the transcript of the hearing and proposed order, is then sent to the order preparation unit, headed by the adjudication counsel. (Tr. at 265). The adjudication counsel prepares the final order for the Commissioner's signature. The Commissioner is authorized to either adopt the ALJ's recommended order, modify it, or reverse or remand the case. (Tr. at 265–267).

The administrative processes of the Division are not per se at issue in this litigation, except that plaintiffs question a number of ACD terminations for "failure to locate" and "failure to cooperate" in which the ACD occurred without the Division following the steps that its rules establish are prerequisite to a proper administrative convenience dismissal. Additionally, plaintiffs seek redress for claimants whose claims were improperly ACD'd because the respondents they named declared bankruptcy. Plaintiffs also challenge the Division's dismissal of cases under

its "new" intake rules, promulgated in November, 1995, which the court ultimately enjoined. Separate from these administrative challenges, the basic thrust of this litigation focuses on the harm caused to the class because of the protracted delays in the processing of class members' complaints.

### C. Summary of the Trial Testimony and Evidence

At the trial, plaintiffs established, through the testimony of individual class representatives, various officials of the Division, and expert witnesses, the length of time required to process a claim from intake to final determination. Plaintiffs sought to show that the protracted delays in processing claims before the Division compromised the successful prosecution of class members' complaints due to the loss of critical evidence and documents, and to witnesses' loss of memory. Plaintiffs also sought to show that the protracted delays had adversely impacted members of the class both emotionally and financially.

Defendants did not contest that protracted delay in processing claims before the Division occurs. Defendants rather sought to show that the processing delays have had at best a minimal adverse impact on the class, that the time to proceed from intake to final determination was now being shortened, and that a concentrated effort was underway to eliminate the Division's backlog. In addition, defendants were permitted to introduce evidence of the Division's determinations which were beneficial to the class during the period embraced by the litigation.

### 1. Evidence at Trial

Defendants provided plaintiffs with a database of some 48,000 cases closed between October 15, 1990, and April 10, 1998, (Tr. at 46–47, 57; PE 1 ¶ 13), *i.e.*, cases where a final favorable or unfavorable disposition had been made.[1] In examining this data, plaintiffs' statistician Robert Faust found that of 43,227 cases the Division closed in this time frame (PE 1 ¶ 29), 34% of that total took more than three years from filing to closing. (Tr. at 71). The mean time for processing was 921 days (Tr. at 72; PE 1 ¶ 29), some-

what in excess of 2½ years. At the Division's Regional level, Faust found that 31% of the probable cause and no probable cause determinations took more than three years. (Tr. at 73). The mean time the Regional Office needed for probable cause determinations was 817 days and for no probable cause determinations was 856 days. (PE 1 ¶ 30(b) and (c)).

Of some 3,947 probable cause determinations resulting in a Commissioner's order, 75% were unresolved after three years, 50% were unresolved after five years, 28% were unresolved after seven years, and 14% remained without a final determination after nine years; the mean measured in days in this category was 2,005 days or 5.5 years. (PE 1 ¶ 34). In 94% of the cases where the probable cause determination was affirmed by the Commissioner's order, the time from filing of the complaint to the final order was more than three years. It also took more than three years in 96% of the cases which resulted in a Commissioner's order dismissing the complaint. (Tr. at 73; PE 1 ¶ 30(e) & (f)). The mean number of days from filing to the affirming order was 2,701 days or 7.4 years, and 2,774 days or 7.6 years from filing to the issuance of an order dismissing the case. (*Id.*)

In this database of 48,000 closed cases, Faust analyzed 5,125 cases dismissed for administrative convenience because of failure to locate, failure to cooperate or bankruptcy. At the regional level, 57% of the cases ACD'd for failure to locate, 44% of the cases ACD'd for failure to cooperate, and 45% of the cases ACD'd for bankruptcy took more than three years from intake to ACD. (Tr. at 68; PE 1 ¶¶ 23–25). At the hearing level, 84% of the cases ACD'd for failure to locate, 94% of cases ACD'd for failure to cooperate and 82% of the cases ACD'd for bankruptcy took more than three years. (Tr. at 69; PE 1 ¶¶ 26–28). Of the 5,125 cases ACD'd in the database of 48,000 closed cases, 1,271 were ACD'd in 1995, 146 in 1996, 123 in 1997, and 29 as of April 30, 1998. (Tr. at 83).

Apart from the database, Faust was given and reviewed 1,206 files. Of these files, 490

---

1. PE is plaintiffs' exhibit; DE is defendants' exhibit; and JE is joint exhibit.

had been ACD'd in 1995, 30 in 1996, and 23 in 1997. (Tr. at 81–82). Division policy required that before a case was ACD'd for failure to locate, the Division would make two telephone calls to the complainant and write two letters, the second letter being certified. If the Division failed to contact the individual the case would be ACD'd for failure to locate. Faust found, however, that this procedure was not always followed. In 20% of the 1,206 cases he reviewed there was no evidence of a phone call being made. In 4% of the cases there was no evidence of either a phone call being made or a letter being sent. (Tr. at 59–60). In extrapolating this data from the 1,206 files to the 5,125 cases ACD'd in the data base, Faust concluded that in 908 cases no phone call was made or no letter sent, and in 182 cases neither a phone call nor a letter preceded dismissal. (Tr. at 61).

The chief ALJ testified that "[g]enerally, according to our rules, once a hearing starts … we do not dismiss the cases based on administrative convenience. So at the hearing, we hardly ever dismiss cases using that method." (Tr. at 825–26). Such dismissals do occur, however, when the complainant fails to appear at the scheduled hearing and is sent a notice but still cannot be contacted. A recommended order for an ACD in such cases is prepared for the Commissioner's signature. If the claimant responds "to the recommended order to the commissioner", the latter will remand the case back to the ALJ to proceed with the hearing. (Tr. at 826).

In the course of the litigation a new policy was put into effect. Deputy Commissioner John Lind testified that, under this new policy, an ACD for failure to cooperate was to be issued only when a complainant had evidence central to a case and was not forthcoming. (Tr. at 770–798). Lind testified that he authored this new policy and that it had been orally communicated to all Division personnel. At the time of trial it had not been reduced to writing and the Division's Manual, which sets forth its procedures and practices, had not been changed. (Tr. at 784). When a case is ACD'd for failure to locate or cooperate, a complainant may have the case reopened. However, no notice is currently giv-

en to parties of such right, nor was any notice given in prior administrations, and there is nothing in the Division Manual on this issue. (Tr. at 780–90).

Some 2,448 complaints were not filed because the 1995 Intake Rules allowed Division personnel to refuse to accept complaints for filing even though the complaints were jurisdictionally correct and timely. The 1995 Intake Rules were enjoined by the court and the Division is undertaking to allow those complainants who were turned away to refile. At present, even when the complaint is not timely, the complainant is so advised and the case accepted if complainant insists. Currently, as it was in the preceding era, no notice is given of the right to reopen a case when the case has been ACD'd for failure to locate or cooperate, and there has been no change in the Division's booklet outlining Division practices for public information.

More recent data shows improvement. As of July 31, 1998, there were some 6,159 cases pending at the regional level. Excluding backlogged cases (i.e., cases pending for two years or more), the average time lag between intake and cause determination, either probable or no probable cause, is now 21 months. (Tr. at 410, 740). The backlogged cases take 34 months. (Tr. at 490).

Lorraine Campbell, the Director of the Case Control and Statistical Information Unit, gave testimony describing the number of "favorable outcomes" in each regional office for each year between 1990 and 1998. "Favorable outcomes" were defined as probable cause determinations ending in settlement, cash award, or withdrawal with agreed benefits to complainant. The Division's "favorable outcome" data consisted of three categories: the number of probable cause determinations in each year, cases in which cash benefits were awarded, and cases with favorable outcomes and non-cash benefits. These categories overlap; benefitted parties may have received more than one kind of relief. Therefore, the reported number of recipients of each kind of relief do not add up to the total number of favorable outcomes for a given year.

Campbell prepared DE C for the case which documents most of the favorable out-

comes for 1990–1993, and all such outcomes for 1993–1998. In 1990, there were 1,847 favorable outcomes: 504 probable cause determinations, 417 cash benefits, and 906 noncash benefits. The cash awards in 1990 totaled $4,120,117. In 1991, there were 2,165 favorable outcomes: 1,002 probable cause determinations, 552 cash benefits, and 591 noncash benefits. The cash award total in 1991 was $4,529,273. In 1992, there were 2,290 favorable outcomes: 1,202 probable cause determinations, 603 cash awards, and 493 noncash benefits. The cash award total in 1992 was $6,395,963. In 1993, there were 2,031 favorable outcomes: 951 probable cause determinations, 620 cash awards and 566 noncash benefits. The 1993, cash award total was $5,348,550. In 1994, there were 1,934 favorable outcomes: 734 probable cause determinations, 728 cash awards and 630 noncash benefits. The cash award total in 1994, was $5,327,725. In 1995, there were 1,851 favorable outcomes: 690 probable cause determinations, 720 cash awards and 630 noncash benefits. The 1995 cash award total was $8,178,974. In 1996, there were 1,475 favorable outcomes: 313 probable cause determinations, 775 cash awards and 552 noncash benefits. The 1996 cash award total was $5,099,824. In 1997, there were 1,426 favorable outcomes. The 1997 cash award total was $5,388,330. From January 1, 1998, to July 31, 1998, there have been 913 favorable outcomes: 260 probable cause determinations, 455 cash awards and 331 non-cash benefits. The cash awards total was $3,601,238. (Tr. at 876–78; DE C and DE OO).

As of July 31, 1998, some 2,745 cases are pending at the hearing level, the same number on hand since March 31, 1997. (Tr. at 271–72; PE 52). It currently takes between four and five years, on average, for a case to be calendared for a hearing after it reaches the hearing unit. (Tr. at 283). The unit, according to its Chief ALJ Denise Washington, is now focusing on calendaring cases filed through 1989, absent significant circumstances. (Tr. at 282). There are approximately 500 cases pending with an intake date in the 1980s, and the Chief ALJ testified: "[i]t is my priority to get these cases on the calendar [for] a public hearing and complete it before the year 2000." (Tr. at 282–83).

With a current staff of eight full-time ALJs and five on a per diem basis (two on call regularly and three on an "as available" basis) (Tr. at 273–74), the backlog of 500 cases pending from the 1980s cannot be disposed of before the year 2000. (Tr. at 283). She also testified that a staff of 25 to 30 ALJs would be needed for the staff to have a manageable case load, which she set at 100 cases per ALJ. (*Id.*)

A number of witnesses testified concerning the impact the delay in processing their claims had on them personally and on their current ability to successfully prosecute their grievances.

Robert High filed a complaint on February 23, 1990, alleging discrimination based on race and age, and alleging retaliation. High testified that he and his attorney made efforts to secure the status of his case from Division officials without success. (Tr. at 118). In a letter to the Division dated August 6, 1997, (PE 13), High writes that in the seven and more years his case has been pending he and his attorney have phoned or written the Division 87 times. In February, 1992, because there had been no movement on the case, High requested and obtained an ACD to process his case in court. In June, 1992, the Division and respondent sought and obtained an order from the New York State Supreme Court (Queens County) remanding the case back to the Division. (Tr. at 293). In December, 1997, a probable cause determination was made (Tr. at 120, 294), and a preliminary conference was scheduled for August, 1998, and then adjourned to September 18, 1998. (Tr. at 121). It is not clear in what status High's case is presently pending before the Division. It is not clear from the record whether the scheduled September preliminary conference is a preliminary settlement conference—in which resolution is the primary focus—or is in effect a pretrial conference in which the parties prepare for a public hearing which the assigned ALJ calendars. In any event, as of the time of trial, High's case had just reached the hearing level eight years after being filed.

High testified that he originally intended to call twenty-three witnesses but now only

three could be located. (Tr. at 124). He could still remember, despite the 8½ year interval, some of the facts and dates, but explained that "a lot of things about my case I can't recall, especially the witnesses that I intended to call and some of the racial comments that were made...." (Tr. at 123–24; PE 13, 14).

High testified that the delay in resolving his complaint had meant that he was not reinstated and both his unemployment and reduced income had caused great financial hardship to him and his family, especially given that he is a single parent with four children. (PE 126–29). He also testified that this experience had caused him to lose faith in the system, lowered his self-esteem and caused severe depression requiring medication. (Tr. at 124, 126–27).

Henri McNulty filed a race and age discrimination claim on November 29, 1989. (Tr. at 214). He had been employed at Columbia University for 35 years before his termination. (Tr. at 215). John Lind, Regional Director at the time, advised McNulty when he filed his complaint that it would take a year to reach a resolution. (Tr. at 215–16). In October, 1993, McNulty was sent a 33–day letter which could have resulted in a dismissal of his case if it was not responded to, even though there had been no response from the University to a November 29, 1989 request. (JE 4).. In 1994, McNulty, who had been diagnosed with prostate cancer, told the Division that he "would like to have this case settled before [he] died." (Tr. at 218).

McNulty testified that the nine-year delay in processing his claim had adversely affected his ability to prove his case. He now gets confused after reading all the documents in the case, finds it difficult to concentrate on the case (Tr. at 221), and has no one to call upon to help him prove his case. (Tr. at 224). He cannot sleep well at night, wonders why his case has not been resolved, and has lost considerable weight waiting for his case to be heard. (Tr. at 222).

Dellie Britt filed his complaint on October 1, 1985. (Tr. at 358). A probable cause determination was made on September 4, 1992. A conciliation conference was held on November 25, 1991, at which time Britt believed his employer had agreed to settle for either $12,-000 or $14,000. (Tr. at 384). However, Britt never received any funds. (Tr. at 368–69, 383–84). The conciliation agreement introduced in evidence as JE 6F. (Tr. at 385), provides in ¶ 5 that the Division deliver the settlement check to Britt after he signed the agreement, which he did on May 4, 1992. (Tr. at 385–86). The Division failed to bring the matter to conclusion by securing the check and delivering it to Britt. On November 14, 1995, the Division stayed proceedings in the case because the respondent had filed a petition in bankruptcy. (Tr. at 388; JE 6G). Britt filed a proof of claim in the bankruptcy proceedings on March 14, 1996.

In the interim, one of Britt's witnesses has died, and he does not know how to reach the other three he intended to rely on to prove his case. (Tr. at 370). Britt testified that he does not remember "a lot of the evidence" at this time (Tr. at 371), and that he was also suffering stress because he was jobless and unable to provide for his family. (Tr. at 374).

Piper Lutbak filed her complaint of sexual harassment in June, 1990. (Tr. at 226). In July, 1991, there was a probable cause determination, but her case proceeded no further. The only communication from the Division was a letter advising her that she could arbitrate her claims if she wished. (Tr. at 237). In December, 1996, she hired an attorney and in March, 1997, a prehearing settlement conference was held, but the case was not resolved. (Id.) Not hearing from the Division about a trial date, Lutbak called the Division and left her name, but no one from the Division called back. She then wrote Governor Pataki. (Tr. at 228, 230; PE 23). On July 30, 1998, her case was called for a prehearing conference. (Tr. at 232). She received the disturbing news that two of her harassers had died, jeopardizing her prospects of prevailing (Tr. at 234–35), and respondent's attorney asked the ALJ whether, in view of the long delay by the Division in bringing the matter to a hearing, respondent was going to be held liable for back wages for the entire period since the case was initially filed, or for only a small portion of that time. (Tr. at 234). A hearing was scheduled for January, 1999. (Tr. at 235).

Lutbak testified that the delay has required her to leave a career she loved and to enter one she did not. She has had to accept a cut in pay and to continually work overtime to make up the difference. (*Id.*) She stated that she is still emotionally affected by the case. "I have lost a lot of my life and there is still no closure...." (Tr. at 236).

Michele Statile filed her complaint in December, 1992. (Tr. at 304). She testified that she kept in contact with the Division so she could receive information on how her case was proceeding. In August, 1993, she filed a change of address with the agency. She called the Division in 1994, and was told her case was still pending. When she called in 1995, however, she learned that the Division had dismissed her case because it could not locate her. (Tr. at 304). It had sent a notice to her old address which she no longer occupied. The Division suggested that she write to request that her case be reopened and that the Division would notify her of its decision. She acted on the Division's suggestion. (Tr. at 307; PE 30). She heard nothing in response. (Tr. at 308). After her testimony at trial, the Division reopened her case. (Tr. at 772). Unfortunately, Statile, not having heard from the agency about her request to reopen her case, felt there was no point in keeping her documents and threw all of them away. (Tr. at 308). She has now lost track of five of her six witnesses (Tr. at 309), and is unsure of some of the facts involved in the controversy. (*Id.*)

Statile testified that she experienced financial difficulty for the first two years after her allegedly discriminatory termination. She learned that her former employer had been sending out unfavorable reports about her to prospective employers. (Tr. at 309–10). When she learned what was happening, she got in touch with her immediate supervisor at her former place of employment and he wrote good references on her behalf, so that is no longer an issue. She believes, however, that had her case been processed more promptly her dire financial hardship—which forced her to move in with her parents—could have been avoided. (Tr. at 310). She also faults the Division's laggard handling of her case with her periodic attacks of depression, headaches, and marital discord. (Tr. at 311–12).

Anita Brooks–Lewis filed a complaint alleging race discrimination on July 20, 1990. (Tr. at 237). A probable cause determination was made in April, 1993. The case has progressed no further since then. She has contacted the Division many times by letter and by phone seeking further movement in her case. No conferences or hearings have been scheduled, apparently because of the Division's heavy backlog and limited staff. In August, 1996, she received a letter advising her of a large backlog of cases awaiting public hearing. (PE 26). Another letter arrived in June, 1997, advising that a wait of several months in scheduling the actual date of her prehearing conference "is well within the framework of our normal case calendaring procedures." (Tr. at 240; PE 27). In 1998, the Division wrote again stating that the hearing unit had some two thousand cases pending and "only a few [ALJ's] to hear these cases. This may result in a lengthy interval before your case is given a calendar date." (Tr. at 241–41; PE 28). The company she worked for is no longer operating. She does not know where the person whom she charged with discriminating against her is located, the people she used to work with are difficult to reach, and she has difficulty remembering the facts. "It is a mental burden to carry .. : [the details of my complaint] for eight years and to [be required to regurgitate it] all over again." (Tr. at 244).

James Close filed a claim of sex discrimination on January 17, 1992. (Tr. at 337). Two years later a probable cause determination was made, and two years after that determination a prehearing conference was held. (Tr. at 339). A public hearing was held in March and April, 1998. (Tr. at 343). At the time of this trial in August, no final determination had been made in Close's case. Close had the help of his own lawyer and an Assemblyman who pressured the Division and Governor Pataki with letters expressing frustration with the length of time the Division was taking in processing his case. (Tr. at 339–43). He testified that the delay deprived him of the use of the testimony of two

potential witnesses because of memory loss and it limited his use of two other persons for similar reasons. (Tr. at 344–45). He testified that his career had been set back by the delay. His complaint challenged his being denied a promotion, at a job where he still works, and he is in effect in limbo at the job site until his complaint is finally decided. (Tr. at 345–46).

Bernadette Thomas filed a claim of race and sex discrimination on February 23, 1987. In May, 1993, she withdrew the sex discrimination claim in connection with a class action suit *sub nom Melanie v. Board of Education* in federal court. In January, 1995, there was a probable cause determination on the race discrimination claim. In June, 1995, the sex discrimination claim was reinstated in the Division proceedings and a probable cause determination was made. (Tr. at 656–58). Since these determinations there has been no further progress in the Division proceedings. Two Congressmen have written to the Division on her behalf (Tr. at 659; JE 11A), but there has still been no progress. In 1996, Thomas decided to pursue her claims in federal court. (Tr. at 660). Three of her witnesses have now died and others have retired or relocated. She continues to work, but without promotion or salary increase, the denial of which had caused her to seek relief from the Division in the first place. (Tr. at 662). She is suffering from anxiety, stress, insomnia, and headaches which she attributes to the way the Division has handled her claims. (Tr. at 661–62).

Jane Doe is the administratrix for John Doe, who filed a race discrimination claim on August 29, 1990 (Tr. at 98–99), and who died on September 13, 1991. (Tr. at 93). No effort was made to contact him until February, 1994, over two years after his death. Division only made contact with Doe's widow (Tr. at 95, 103; JE 2). A no probable cause determination was rendered in 1995. (Tr. at 102). John Doe was the only person, as far as his widow knew, who had personal knowledge of the facts in the case and whose testimony could have avoided a no probable cause determination.

Clarice Seegers filed a claim on May 11, 1990, charging that she had been subjected to discrimination based on her race, sex, and disability. (PE 53 at 15). A probable cause determination was made and a public hearing was conducted in April, 1997, and concluded on August 7, 1997. On December 12, 1997, she received notice of a recommended ALJ decision awarding her $17,503.00 in back pay and $7,500.00 in compensatory damages. An award of prejudgement interest was not recommended. (*Id.* at 13–14). She settled with respondent on September 9, 1998.

Altheria Anderson filed a claim of race discrimination in housing on December 21, 1990. (Tr. at 324). On December 1, 1997, a Commissioner's order was issued awarding her $10,000.00 for pain and suffering and $10,000.00 in punitive damages. She has been unsuccessful thus far in her effort to collect on the judgment. (Tr. at 328). She testified that the seven year delay caused her to suffer emotional trauma emanating from her feelings of not being heard and of being pushed aside. (Tr. at 328–29).

In September, 1992, Michael Campbell filed a complaint of race discrimination in housing. (PE 37, at 8–9). A probable cause determination was made in June, 1993. (*Id.* at 11). No other Division activity occurred in the case, and he settled in July, 1997. At that time, Campbell believed he had a terminal illness (*i.e.*, inoperable blood clots on the brain). (*Id.* at 23–25). He testified that the way his case had been handled by the Division had resulted in his loss of faith in the government. (*Id.* at 26).

Carol Mandros filed a disability discrimination claim on February 12, 1989. (PE 38). She died on February 22, 1994, with no resolution of her claim by the Division. (PE 39).

Plaintiffs offered the testimony of Sheila Akabas, Director of the Center for Social Policy in the Workplace at Columbia University. Akabas is an expert on memory and on the psychological and emotional effects experienced by those discriminated against, or those who perceive themselves to be so victimized by a governmental agency's long delays in processing their discrimination claims–*i.e.*, by those very agencies charged with vindicating their right to be free of discriminatory conduct. She testified that the literature indicated that those discrimi-

nated against feel helpless and frustrated, and that governmental delays in processing their discrimination claims can only add to these feelings, particularly since it is unusual for people in the workplace to make formal complaints of discrimination because of fear of retaliation and loss of their jobs. Persons who file formal complaints feel vulnerable in bringing attention to themselves out of concern that they will not be believed. She testified that among people of color in this country there is a learned helplessness, a perceived futility in complaining about discrimination that is intensified when, after deciding to proceed, an individual is told that a huge backlog of cases will result in extended administrative delays. She also testified that memory fades over time; and that a participant or principal to an event is likely to retain memory of the events longer and more clearly than a witness with no stake in the outcome. Her testimony was general. She had not interviewed any of the class representatives. (Tr. at 430–488).

Shawn Utsey, professor in the Department of Psychology at Seton Hall, testified as an expert on the trauma experienced by African–Americans when their claims of discrimination are subjected to inordinate processing delays by those state agencies from which they are supposed to secure redress. In this country, discrimination has a constant impact on blacks, and delays by the government in processing their claims is felt as another impact of discrimination. Most blacks want to avoid confronting racism and seek to exhaust other possibilities before concluding that race discrimination has occurred. Delays in processing claims of discrimination discourage blacks and reinforce cynicism about those government agencies established to protect them. Some will be sufficiently discouraged to abandon their cases. Utsey also gave generalized testimony, based on his and other psychological and sociological studies, which established that, based on the history of race relations in this country, blacks who file discrimination claims with a governmental body to secure redress, and who are seemingly ignored, become emotionally disturbed and lose faith in the system. (Tr. at 172–208). This seems more or less common sense.

None of these experts had examined any of the individual claimants, so their testimony amounted to general truisms of what the norm would be among claimants similarly situated. Defendants' expert took issue with some of the opinions voiced by the memory expert, but since the only use of her opinion to the court was that memory fades over time, and that one not central to the events but a bystander is likely to forget what happened more quickly than the figure central to the events, an opinion with which defendants' expert did not seriously contest, the court also classified her testimony as common sense. In sum the experts, other than Robert Faust the statistician, had little influence on the court's thinking.

The testimony of the individual claimants and class representative as to the effect of the delays on their ability to recall the events, on how the delay had seriously dimmed the recollection of proposed witnesses of critical events, on how over time contact had been lost with witnesses and respondents who had moved away or died, and had adversely and fatally compromised certain of the claimants' ability to successfully support their claims, was not challenged. The fact that all of this adversely impacted claimants emotionally cannot be seriously disputed.

The policy of ACD dismissals for failure to locate and failure to cooperate was changed in 1995. The current, more "complainant-friendly" approach should result in fewer ACD terminations. Prior to the change a case was ACD'd for failure to locate if the Division sent two letters to the complainant's listed address (one regular and one by certified mail) plus placed two telephone calls. If there was no response to these efforts the case was ACD'd. The new policy requires the Division to process the case to a conclusion on the merits if that can be done without the complainant being available. Thus, under the current policy, the complaint can be processed to a probable cause determination while efforts go forward to locate the complainant.

(Tr. at 713–14).

No complaint will now be ACD'd for failure to cooperate unless a complainant in posses-

sion of information without which the case cannot be processed refuses to come forward with that critical information. (Tr. at 704). This new policy is also likely to increase the number of cases being processed, or awaiting to be processed, at the regional level.

The Division also ACD'd cases on notice that the respondent was in bankruptcy (Tr. at 523–24), but the Chief ALJ testified that cases are not supposed to be ACD'd on this basis. (Tr. at 839; Regional Office Manual (DE CC at XX1–6 & XXV–14 § d)). If this practice is ended, there will be additional cases pending.

### III. ANALYSIS

The court begins its analysis with Division's challenges to the plaintiff subclasses, as these challenges are equivalent to standing challenges. *See Lewis v. Casey*, 518 U.S. 343, 349–50, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (explaining that the court must find that the named plaintiffs for a class litigated the facts necessary to establish classwide injury before awarding plaintiffs relief). Therefore, the court begins with the question of whether the named plaintiffs have shown that the plaintiff subclasses suffered "actual harm." *Id.* at 349, 116 S.Ct. 2174.

### A. CHALLENGES TO CLASS CERTIFICATION

#### 1. Challenges to the NOW I Certification Orders

Defendants first argue that they were unable to defend against the plaintiff subclasses' claims because the classes are overbroad and they do not have properly identified named plaintiffs. (Def. Post Trial Mem. of Law at 177). Defendants' goal is to have the court decertify the plaintiff subclasses and require plaintiffs to prove that defendants are liable to them on an individual basis. See *Sirota v. Solitron Devices*, 673 F.2d 566, 572 (2d Cir.1982) (recognizing option but declining to decertify).

2. Post trial subclass A members raise two additional claims: (1) they claim that they were injured when Division dismissed their claims because

Defendants base their claim on *Marisol A. v. Giuliani*, 126 F.3d 372, 375 (2d Cir.1997), a case in which the Second Circuit established that, prior to trial, the court has a duty to separate overbroad and ambiguously defined classes into appropriately defined subclasses. *Marisol*, however, merely reminds courts to subject each subclass to a rigorous analysis under Rule 23 prior to trial. *Cf. Burka v. New York City Transit Auth.*, 110 F.R.D. 595, 600 (S.D.N.Y.1986) (Goettel, J.) (explaining that each subclass must comport with Rule 23). Therefore, defendants' challenges must be considered in light of Rule 23(a) prerequisites, namely the requirements of numerosity, commonality, typicality, and adequacy. *See Monaco v. Stone*, 187 F.R.D. 50, 60–63 (E.D.N.Y.1999).

#### a. Challenges to Subclass A

██ Defendants argue that they did not have adequate notice of the claims raised for subclass A. In *NOW I*, the court recognized subclass A as "all persons who have been, are or may be subject to dismissal of their complaints because defendant Margarita Rosa, [Division] Commissioner, has taken longer than three years from the date the complaint was filed to finally resolve the complaint." *NOW I*, 182 F.R.D. at 33. The claims raised for the class were that Division's delays had led to the loss of evidence, and the loss of witnesses, and therefore created the risk that members of subclass A would have their claims erroneously dismissed in violation of their due process rights. *Id.* at 32 (discussing these claims as part of the original class encompassing subclasses A and B). Doe, Britt, Seegers, and Thomas, were identified as subclass A's named plaintiffs, and their complaints raised the issues necessary to establish class wide liability for subclass A. *See, e.g.*, (Segeers Cmplt. 3, 7, 8) (arguing that Division's delay caused her to forget the facts about her discrimination incident and lose her witnesses); (Doe Revised Proposed Intervenor Cmplt. at 1–2) (claiming that the complaining witness died before Division contacted him).[2]

cause of respondents' bankruptcy, and (2) that Division's delays caused emotional injury leading them to abandon their claims. (Def. Post Trial

Defendants next contend that the named plaintiffs for Subclass A did not litigate the issues necessary for a finding of class wide liability. However, named plaintiffs presented evidence about how Division's delay led to the loss of witnesses (Tr. at 661) (Thomas); (Tr. at 96) (Doe); (Tr. at 363–64, 371) (Britt), and evidence on how Divisions delay caused them emotional injury (Tr. at 374) (Britt); (Tr. at 98) (Doe); (Tr. at 661–62) (Thomas).

### b. Challenges to Subclass B

■ Defendants also contend that subclass B was imprecisely defined and therefore they could not defend against the claims raised by the class. In *NOW I* the court recognized subclass B as "all persons who have been, are, or may be subject to a reduction in monetary relief awarded, either by order of Commissioner Rosa or by court order, because it has taken longer than three years from the date the complaint was filed to render a final administrative determination." *NOW I*, 182 F.R.D. at 33. Prior to trial, plaintiffs indicated that subclass B's members were raising equal protection and due process claims against Division, alleging that Division's delay in processing their claims led to their discrimination awards being reduced. *Id.* at 32.

Defendants also contend that no named plaintiff represented subclass B. However, Clarice Seegers, the named plaintiff for subclass B, presented circumstantial proof that the ALJ in her case did not award her prejudgment interest on her award because of Division's delay, (PE 53 at 13–15), and she presented the court with New York state precedent showing that persons' prejudgment interest and damage awards were discounted by the amount of time attributable to Division's delay. *See, e.g., State Univ. Agric. and Tech. College at Farmingdale v. State Div. of Human Rights*, 134 A.D.2d 339, 520 N.Y.S.2d 814 (1987) (reducing backpay award); *State Div. of Human Rights v. Massive Econ. Neighborhood Dev. Inc.*, 47 A.D.2d 187, 366 N.Y.S.2d 23 (1975) (reducing prejudgement interest award).

Defendants next argue that Seegers's damage award was not reduced because of Division's delay, and therefore she did not prove the injury raised for subclass B. However, a named plaintiff can litigate the interests of a class when the trial evidence shows he has not been injured by defendant, as long as plaintiff's claim raises the issues necessary to determine whether the injury allegedly inflicted on the class occurred. *See Sirota*, 673 F.2d at 572. The evidence described above was sufficient to raise the issues relevant to subclass B's claim.

### c. Challenges to Subclass C

■ Defendants also contend that subclass C was ambiguously defined, and therefore they were unable to defend against the class's claims. In *NOW I* subclass C was defined as being composed of persons who "may be subject to administrative convenience dismissals because [Division] was unable to locate complainants or [Division] determined that the complainants had failed to cooperate and such complaints had been pending at [Division] for more than one year." *NOW I*, 182 F.R.D. at 35. The *NOW I* decision also identified subclass C's named plaintiffs: NOW and, if NOW failed to be an adequate representative, Britt and Seegers would serve in this capacity. *NOW I*, 182 F.R.D. at 36. Defendants were also informed that subclass C's members alleged that Division's use of an ambiguous ACD notification letter, and its failure to follow reasonable procedures for contacting complainants at risk for ACD violated plaintiffs' due process rights. (*See* Plf. Intervenors' Mem. of Law at 5–9).

Defendants next allege that the named plaintiffs for subclass C, NOW, Britt and Seegers, failed to prove at trial that they suffered the injuries from the ACD process raised by subclass C. Defendants' challenge to NOW's representation of subclass C requires the court to determine whether NOW

Mem. of Law at 10–12). No named plaintiff litigated whether Division erroneously dismissed complaints based on the named respondent's bankruptcy; therefore this claim is not reviewed. The claim regarding plaintiffs' emotional injuries

is related to subclass A's other claims that Division's delay caused them harm, and because this issue was raised prior to trial, *see NOW I*, 182 F.R.D. at 37, the claim is included in the court's analysis.

can show that (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief sought requires the participation of individual members in the litigation. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Only the claim raised is at issue here, as NOW's challenges to Division's ACD process could be brought by its own members, and it raises a claim germane to its purpose in remedying discrimination. Lastly, NOW only seeks injunctive relief which does not require proof of individualized damages. *Id.*

■ Associations with representational standing generally are barred from raising claims requiring individualized proof. *See Miller v. Silbermann*, 951 F.Supp. 485, 491 (S.D.N.Y.1997) (Kram, J.). They may, however, raise claims that require the court to compare the defendant's policy or laws with another legal standard. *See NOW v. Terry*, 886 F.2d 1339, 1348 (2d Cir.1989).

■ NOW brought three challenges to Division's ACD procedures. First, NOW alleged that Division's complainant contact policies for persons at risk for ACD, on their face, violated complainants' due process rights because they provided insufficient notice of the impending termination of complainants' claims. Second, NOW challenged Division's use of an ambiguous ACD warning letter [Hereinafter "Post 1991 ACD letter"] to inform parties that they were at risk for ACD. Third, NOW challenged the Division's ACD process as applied, arguing that Division failed to follow its own procedures for contacting complainants and therefore arbitrarily extinguished plaintiffs rights.

NOW may raise two challenges to the ACD process: whether the Post 1991 ACD letter and the Division's complainant contact procedures comport with the requirements of the due process clause. NOW may raise these claims because they only require the court to compare Division's policies with due process standards. Plaintiffs third claim, the "as applied" challenge to Division's ACD complainant contact procedures is barred, as the claim requires a showing that individual plaintiffs who complied with Division procedures still had their claims dismissed under the ACD policy. Because NOW cannot properly raise the "as applied challenge" the court considers whether Britt and Seegers can litigate this issue.

■ The trial evidence, however, shows that Seegers did not litigate the issues necessary to determine whether the ACD process inflicted due process injury on subclass C's members. *See Lewis*, 518 U.S. at 356, 116 S.Ct. 2174. Seegers never received an ACD letter; she was not subject to a Division official's omission that resulted in her claim being terminated; and she did not suffer injury because she failed to respond to an ambiguous Division communication. These were the issues and circumstances subclass C alleged would prove their injuries. *(See* Plf. Intervenors' Mem. of Law at 5–9). Britt, while he received an ACD letter, did not receive the "Post 1991 ACD Letter" subclass C alleges inflicted its injuries; additionally, Britt responded to the letter without suffering detriment to his claim. (Tr. at 368). In light of the evidence presented at trial, the court must conclude that none of the named plaintiffs for subclass C provided the court with sufficient basis to make a finding on the class's as applied challenge to Division's ACD complainant contact procedures.

### 2. *Class Certification Challenges Under NOW II*

Defendants also argue that *NOW II* mooted subclass A's and subclass B's claims because the decision granted defendants qualified immunity from the claims of persons with pending complaints at Division, and persons in subclasses A and B, by definition, have pending claims. Defendants' claim fails on two grounds. First, there are members of subclasses A and B who have damage claims against defendants: these plaintiffs' claims have been finally dismissed or resolved, yet plaintiffs can show that evidence in their cases was lost or their damage awards reduced because of Division's delay. Second, although *NOW II* bars plaintiffs with

pending claims from seeking damages from defendants, these plaintiffs may still seek declaratory or injunctive relief. *See Ramirez v. Coughlin*, 919 F.Supp. 617, 622 (N.D.N.Y.1996).

■ Defendants next argue that the *NOW II* decision required plaintiffs' counsel to recertify the plaintiff subclasses in order to distinguish between plaintiffs solely entitled to injunctive relief and those eligible to receive money damages. The court cannot identify any way in which plaintiffs' counsel's failure to recertify the classes compromised the defense. The distinction between pending and non-pending claims would only have had significance after the trial determining whether defendants were liable to plaintiffs. The court, therefore, rejects defendants' claim that its decision to allow the plaintiff classes to litigate the question of liability without splitting the classes harmed defendants' case.[3]

The court summarizes its decisions regarding defendants' class certification challenges here. Subclass A, represented by Doe, Britt, Seegers, and Thomas, is comprised of persons who allege that because of Division's delay they lost evidence and witnesses and suffered emotional injury, all of which subjected them to the risk of erroneous dismissal of their claims and therefore violated their due process and equal protection rights. Subclass B's members, represented by Seegers, allege that Division's delay caused the damage awards in their cases to be discounted for the amount of time attributable to Division's delay and therefore violated their equal protection and due process rights. Subclass C is represented by NOW; NOW alleges that Division's complaint contact procedures, on their face, violated subclass C members' due process rights.

---

**3.** Defendants improperly read *NOW II* as stating that all the claims in this action must be brought under *Polk* to be valid. *See Defendants Post Trial Mem. of Law* at 180. However, when the court recognized that some claims in this case might be "factually distinguishable from th[e claim] ... asserted in *Polk*," it merely indicated that the plaintiffs whose claims were not controlled by *Polk* could sue for damages. *NOW II*, 14 F.Supp.2d at 429.

## B. DUE PROCESS CLAIMS

### 1. Complainants' Property Interest

■ All of the plaintiffs' claims are based on *Logan v. Zimmerman*, 455 U.S. 422, 434, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), a case which they allege establishes that persons have a federally protected property interest in the state law discrimination claims they submit to state administrative bodies for adjudication. In *Logan*, appellant sued a state administrative commission that adjudicated state law discrimination complaints when the commission terminated his complaint. The commission terminated the complaint because its staff had failed to timely hold a statutorily-mandated employer-employee conference on the appellant's employment discrimination complaint. Appellant alleged that the commission had deprived him of his complaint without due process of law. The Supreme Court held that plaintiffs' property interest in the complaint entitled him to have the Commission consider the merits of his charge, "based on the substantiality of the available evidence, before deciding whether to terminate his claim," *id.* at 434–35, 102 S.Ct. 1148, and that the complaint could not be terminated except "for cause" based upon the evidence in the complaint, *id.* at 431–32, 102 S.Ct. 1148, or alternatively, it might be "surrendered for value." *Id.* The *Logan* decision makes it clear that the "State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Id.* at 434, 102 S.Ct. 1148.[4]

Defendants contend that plaintiffs do not have an independent property interest in the state law discrimination claims they submit to Division because under *Polk* plaintiffs only have one property interest in the "full remedial scheme" of civil rights laws. *Polk*, 711 F.2d at 508.[5] Defendants argue that, as long

---

**4.** The *Logan* Court, however, did recognize that a complaint legitimately may be dismissed by the state because of procedural defects, such as an expired statute of limitations. *See Logan*, 455 U.S. at 437, 102 S.Ct. 1148.

**5.** Defendants argue that *Polk* bars plaintiffs' claim that they have a property interest in Division's intake rules or the case processing time limits established under the HRL. *See Polk*, 711

as a plaintiff's federal or state claim on a discrimination incident remains pending, the plaintiff cannot show that he has been deprived of his property interest in the claim. Defendants' argument, however, does not give sufficient weight to the distinct and independent value that federal and state law claims have, or the independent value court adjudicated and administratively resolved claims have. Indeed, several recent cases recognize the need to keep one's federal and state discrimination claims from having preclusive effect on one another. *See e.g., Astoria Fed. Sav. & Loan v. Solimino*, 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). Additionally, the New York courts have recognized that "[t]he administrative forum offers a complainant remedies not available from a court." *Marine Midland Bank v. New York State Div. of Human Rights*, 75 N.Y.2d 240, 244, 552 N.Y.S.2d 65, 551 N.E.2d 558 (1989). *See also Murphy v. Am. Home Prods.*, 58 N.Y.2d 293, 307, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983). Both sources of precedent counsel against treating plaintiffs as having one property interest in the full remedial scheme of civil rights laws.

However, even if plaintiffs have a single property interest in the full remedial scheme of civil rights laws, plaintiffs' here contend that their complaints at Division are the only property interest available to them under the scheme because they are, for various reasons, unable to present their claims in state court or federal venues. *Cf. Polk*, 711 F.2d at 508. Plaintiffs point out that in many cases there are state law barriers preventing them from filing state court claims on incidents they have filed complaints about with Division. Under 18 N.Y. Exec. L. § 297.9, a person must choose between asserting his state law claims in court or through Division. Once a Division complaint is filed, the complainant cannot bring a state law claim in court on the incident until Division grants him an ACD dismissal. *See Murphy*, 58

N.Y.2d at 307, 461 N.Y.S.2d 232, 448 N.E.2d 86. The August 5, 1997 amendments to the HRL now allow complainants to request that Division ACD their claims to allow them to bring claims in state court. *See Moodie v. Fed. Reserve Bank of New York*, 58 F.3d 879 (2d Cir.1995). However, this option does not help many plaintiffs, for the Amendments also provide that persons whom request an ACD will be bound by the three year statute of limitations for their claims marked as of the date they initially filed their complaints with Division. *See* 18 N.Y. Exec. L. § 297.9. (DE "A", 1996–1997 Report at 29). Therefore, members of the plaintiff subclasses "whose complaints have not been finally administratively adjudicated or otherwise resolved within three years of the date of the filing of the complaint" will be unable to seek redress under the 1997 Amendments.[6] *NOW I*, 182 F.R.D. at 33.

The court also recognizes that many of the plaintiffs cannot bring federal claims because federal law does not provide a cause of action for all injuries recognized under the HRL. *See, e.g.*, 18 N.Y. Exec. L. § 296.1 (describing exclusive state law remedy for discrimination based on "genetic predisposition"); *see also, Reeves v. Johnson Controls World Servs.*, 140 F.3d 144, 154–55 (2d Cir.1998) (noting that the HRL protects a larger universe of disability-based discrimination). The state and federal anti-discrimination laws also vary on matters such as jurisdiction and statute of limitations. *Compare* 18 N.Y. Exec. L. § 292.5 (defining "employer" covered by the HRL as employers with 4 or more employees), *with* 42 U.S.C. § 2000e(b) (defining "employer" covered by Title VII as employers with 15 or more employees).

In short, the court finds that plaintiffs have shown that they are barred from pursuing claims outside of Division either because of the distinctions between the federal and

---

F.2d at 509. However, plaintiffs are not making the claim raised in *Polk*; rather they assert that they have a right to reasonable access to Division, and a right to have Division process their claims in a manner that does not arbitrarily deprive them of their interests.

**6.** The statute of limitations for an HRL claim is generally tolled under N.Y.C.P.L.R. § 204 during

the period the complaint is before the Division. *See Pan Am. World Airways, Inc. v. New York State Human Rights Appeal Bd.*, 61 N.Y.2d 542, 549, 475 N.Y.S.2d 256, 463 N.E.2d 597 (1984). However, persons who request an ACD under the 1997 Amendments are denied this tolling option.

state civil rights laws or because of state law procedural barriers, and therefore they have a property interest in their Division complaints because these complaints are their only means to address their discrimination claims.

### 2. Deprivation of the Property Interest

Defendants ask the court to dismiss all plaintiffs' claims who have complaints pending at Division because *Polk* establishes that persons with complaints pending before Division (or any other tribunal) cannot show that Division has deprived them of their complaints, as these pending claims are proof that plaintiffs' property interest in their complaints have not yet been destroyed. Indeed, in *Polk* the Second Circuit rejected the appellant's claim that Division had deprived him of his property interest in his discrimination claim because the appellant had a pending Title VII action based on the same discrimination incident. *See Polk*, 711 F.2d at 509. The Court of Appeals concluded that it could not determine whether Division had deprived appellant of his property interest in his claim until the Title VII claim was resolved because the Title VII decision might make him whole. *Id.*

■■■ This court, however, does not view *Polk* as a barrier to the plaintiff classes' claims. The *Polk* Court rejected Polk's claim of prejudice because it was "an assertion only," *id.* at 509, suggesting that he had provided no evidence to support his contentions. The *Polk* Court left open the possibility that if Polk's Title VII claim were dismissed because of Division's delay, this dismissal might be factored into its decision as to whether he had suffered prejudice. *Id.* at 509. n. 3. The court concludes that the *Polk* case is different from the instant action because plaintiffs here have provided specific evidence of how their claims have already been compromised by Division's delays, and because they have

demonstrated that many plaintiffs do not have alternate adjudication methods open to them.

■■■ Defendants next argue that *Polk* establishes that Division's administrative delays cannot deprive persons of their property interest in their claims, and therefore plaintiffs' claims must be rejected. The *Polk* Court actually concluded that a plaintiff's mere "assertion" that Division's delay caused him injury would not support a due process claim. *See Polk*, 711 F.2d at 509. In other cases the Second Circuit has held that unreasonable administrative delay may result in the deprivation of property. For example, in *Kraebel v. New York City Department of Housing Preservation and Development*, 959 F.2d 395, 404 (2d Cir.1992), the Second Circuit found that a city housing program's delay in processing reimbursement applications could deprive landlords of their property interests in the right to payment. *See also, Isaacs v. Bowen*, 865 F.2d 468, 477 (2d Cir. 1989) (recognizing that delay can deprive persons of their property interests).[7]

Furthermore, an administrative delay causing actual prejudice to a plaintiff's claim is sufficient to show deprivation under the due process clause. *See, e.g., DeMichele v. Greenburgh Cent. Sch. Dist. No. 7*, 167 F.3d 784, 790–91 (2d Cir.1999) (finding that "a showing of actual prejudice" is an essential element of a due process claim of unconstitutional delay). Actual prejudice is shown when plaintiff demonstrates that delay led to the loss of documentary evidence or a key witness. *See United States v. Lovasco*, 431 U.S. 783, 796, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) (describing loss of material witnesses as actual prejudice); *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir.1999) (same). Therefore, the court concludes that plaintiffs may prevail on their claim that Division's delays deprived them of their property interest in their discrimination claims, if they show that Division's delay actually prejudiced their claims.

---

7. The mere fact that a claim is pending at Division cannot, by itself, preclude a due process claim; otherwise, no amount of administrative delay would ever implicate complainants' property rights. *See Kraebel*, 959 F.2d at 405 ("implicit in the conferral of an entitlement is a further entitlement to receive the entitlement within a reasonable time").

#### a. Subclass A's Evidence of Actual Prejudice.

■ Plaintiffs in subclass A claim that Division's processing delays eroded the evidentiary basis for their claims, and therefore actually prejudiced their claims. Named plaintiffs demonstrated that the class was in fact injured: Dellie Britt testified that he lost witnesses, (Tr. at 370) as did Bernadette Thomas (Tr. at 661). Other witnesses established that the injury was widespread within the class: including, Robert High, (Tr. at 124) (testifying that he lost twenty of his twenty-three witnesses); Piper Lutbak (Tr. at 234–35) (testifying that two of her harassers died in the eight year period her claim was pending); Anita Brooks–Lewis (Tr. at 242) (testifying that the respondent company named in her complaint closed and her respondent harasser cannot be located). These facts are sufficient to show that persons in subclass A who lost witnesses suffered actual prejudice as a result of Division's delays.[8]

Subclass A also presented proof that Division's delays sometimes resulted in a complaining witness dying before Division began adjudicating his claim. The court received evidence showing that named plaintiff John Doe passed away while his complaint was pending, and evidence showing that Division ultimately rendered a no probable cause determination on his case. (Tr. at 93). Doe's widow testified that Doe was the only person who had personal knowledge of the facts of his case. (Tr. at 102–103). The court also received evidence showing that other class members suffered the same injury. (PE 38) (describing similar scenario involving complainant Carol Mandros). These facts were sufficient to prove that the group of plaintiffs in subclass A who died before their claims were processed suffered actual prejudice as a result of Division's delays.

Plaintiffs in subclass A also claim that Division's delays led complainants to lose their memories of the events that are the basis for their discrimination claims. The Second Circuit, however, has established that proof of memory loss, standing alone, is insufficient to establish that a claim was actually prejudiced by delay. *See De Michele,* 167 F.3d at 791; *United States v. Elsbery,* 602 F.2d 1054, 1059 (2d Cir.1979) (same). Therefore, this claim of prejudice fails.

Plaintiffs in subclass A also claim that Division's processing delays caused them emotional injury which prejudiced their claims because their injuries compromised their ability to prosecute their complaints. The court could find no authority that recognizes emotional injury as a form of actual prejudice, and the nexus between the injury and the processing delay seems too tenuous to support a finding of actual prejudice. Therefore, the court rejects this claim.

#### b. Subclass B's Evidence of Actual Prejudice

■ Plaintiffs in subclass B contend that Division violated their due process rights when Division officials discounted their prejudgment interest and backpay awards to account for the amount of time attributable to Division's processing delays. Plaintiffs' claim is based on the assumption that persons have a property interest in prejudgment interest and backpay awards. However, New York law establishes that these awards are not automatic entitlements under the HRL, but rather are conferred at Division's discretion. *See* 18 N.Y. Exec. L. § 297(4)(c)(ii) (explaining that Division can construct an award "with or without backpay"); *see also,* N.Y.C.P.L.R. § 5001(a) (explaining that the court has discretion to award prejudgment interest). Therefore, the court concludes that Division officials' actions, reducing these awards, did not violate plaintiffs' due process rights as plaintiffs

---

8. In *NOW II,* the qualified immunity decision on this case, the court held that defendants reasonably could have interpreted *Polk* to provide that they were not depriving plaintiffs of their property rights in their Division complaints as long as the complaints were pending before Division or another tribunal. *NOW II,* 14 F.Supp.2d at 427.

The court's decision did not establish that this was the correct interpretation of *Polk,* as the court identified precedent that supported the conclusion that due process protections attach prior to the final destruction of a claim. *NOW II,* 14 F.Supp.2d at 429.

have no property interest in these kinds of damage awards.

### c. Subclass C: Deprivation From ACD Determination Process

NOW, on behalf of subclass C, contends that Division's complainant contact procedures for persons at risk for "failure to locate" and "failure to cooperate" ACD's violated subclass C's members due process rights because Division failed to take adequate steps to locate persons at risk for ACD before dismissing their claims. The court considers whether the state's procedures were "reasonably calculated, under all the circumstances, to apprise [the] interested part[y] of the pendency of the [state's] action and afford [him] an opportunity to present [his] objections." *Tulsa Prof'l Collection Servs., Inc. v. Pope,* 485 U.S. 478, 484, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988).

At trial, plaintiff NOW presented evidence showing that Division had an established policy of subjecting claims to ACD for "failure to locate" and "failure to cooperate." (PE 1). NOW also showed that under the ACD policy Division officials were required to make two phone calls and mail two letters to the complaining party before dismissing his complaint. (Tr. at 496 & DE CC at XXV–13). NOW also provided evidence showing that Division officials relied on mail forwarding to contact complainants whose files had been pending for more than one year, knowing that the post office does not forward mail for more than one year after a party's move. (Tr. at 496). Plaintiff also showed that Division had other information, such as complainants' social security numbers, that could easily have allowed the agency to locate missing complainants, yet the agency failed to use this information. (DE CC at XV–2) In light of this evidence, the court concludes that Division did not take all reasonable steps to apprise complainants that their claims were at risk for ACD, and therefore deprived complainants of their claims without adequate predeprivation notice.

Additionally, NOW alleges that Division's ambiguous "Post 1991 ACD Letter" failed to provide complainants with proper predeprivation notice about the impending ACD determinations they faced. NOW's claim is based on *Christopher v. Secretary of* *Health & Human Services,* 702 F.Supp. 41, 43 (N.D.N.Y.1989), which establishes that "even a notice which is merely ambiguous may violate an applicant's due process rights." Indeed, in that case, the court recognized that a letter's "very ambiguity may cause it to be misleading .... [and] may prevent the notice from being of such a nature as reasonable to convey the required information." *Id.* (citations omitted).

Plaintiffs presented both circumstantial and direct evidence showing that the "Post 1991 ACD Letter" was insufficient to inform complainants that they were required to contact Division in order to continue their cases, and it did not inform complainants of their right to contest an ACD determination. The court received testimony from Deputy Commissioner Lind that the "Post 1991 ACD Letter" did not adequately inform parties that their claims were at risk for ACD. (Tr. at 505). Additionally, the court received evidence showing that prior to 1991, before the Division was under pressure to reduce its backlog of cases, the Division informed complainants of impending ACD determinations in a much clearer letter. (PE 7). Given this evidence, the court finds that the Division's "Post 1991 ACD Letter" was not designed to actually inform parties at risk of ACD of the steps necessary to avoid an ACD determination, or inform them about the steps necessary to reopen their complaints, and therefore these letters deprived plaintiffs of their property interest in their claims without proper predeprivation notice.

In summary, the only plaintiffs who have shown that they were deprived of a property interest are 1) subclass A's members who showed that Division's delays prejudiced their claims because the delays led to the loss of witnesses and 2) subclass C's members whose claims were terminated as a result of Division's "Post 1991 ACD Letter" and Division's ACD complainant contact procedures.

### 3. Matthews v. Eldrige Analysis

The court next turns to the question of whether plaintiffs in subclasses A and C were afforded the constitutional process they were due. *Matthews v. Eldrige* requires that the court consider: 1) the pri-

vate interest that will be affected by the official action; 2) the risk of erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and 3) the state's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See Mathews,* 424 U.S. at 335, 96 S.Ct. 893.

### a. Subclass A's Claims

### i. Private Interest Affected

■ "The private interest affected by Division's [case processing] practices is that involved in deterring and being free of discrimination. . . ." *NOW II,* 14 F.Supp.2d at 433. This interest includes the right to have one's discrimination complaint considered based on the substantiality of the evidence and without being subject to erroneous dismissal or prejudice. *See Logan,* 455 U.S. at 430, 102 S.Ct. 1148. Rather than being merely a private interest, the interest in remedying discrimination is "shared by the plaintiff-intervenors and society generally." *NOW II,* 14 F.Supp.2d at 433. This interest flows from a "bedrock constitutional principle," and is reflected in federal and state constitutional and statutory causes of action. *Id.* The court recognizes that subclass A raises a powerful private interest in its claims. If society does not take this interest seriously we all will suffer, as "[i]njustice anywhere is a threat to justice everywhere." Martin Luther King, Jr., Letter From A Birmingham Jail (Apr. 16, 1963), in Why We Can't Wait 76, 77 (1964). Therefore, the court gives great weight to the private interest at issue in subclass A's claims.

### ii. Risk of Erroneous Deprivation and Value of Substitute Procedure

Plaintiffs in subclass A have already shown that Division's processing delays have seriously compromised their discrimination claims, resulting in the loss of witnesses. The potential risk of erroneous deprivation has already come to fruition in this case. While the court recognizes that administrative delay is an unfortunate and ever present

factor in dealing with an administrative agency, it also recognizes that Division's processing delays, which typically are in excess of three years, expose complainants to serious risk that the evidentiary basis for their claims will erode. Plaintiffs contend that a substitute procedure that permits Division to both rigorously and quickly assess claims will reduce the risk of an erroneous deprivation. Defendant Commissioner Mercado conceded as much when he recognized that "older cases are considerably more difficult to investigate and close." (PE 41) The court acknowledges that Mercado's efficiency improvement policies have in several cases trampled on complainants' rights; however, the policies also show that Division recognizes that a faster processing time would improve plaintiffs' ability to vindicate their interest in their discrimination complaints.

### iii. State's Interest

Defendants claim that complaint processing is a highly complex and time consuming task, and that it would be an enormous fiscal burden if Division were required to process complaints within the three year period suggested by plaintiffs. Defendants' arguments concerning the practicalities of administering the HRL warrant substantial deference. *See Kraebel,* 959 F.2d at 406. Division's investigatory tasks demand considerable attention, skill, work, and time. The court recognizes that Division's staff has endeavored to fulfill the State's commitment to equal opportunity in good faith. Therefore the court concludes that Division's concerns about properly carrying out its responsibility must be given some weight. *See id.*

Even after according Division's perspective due deference, the court concludes that the agency's request for an unlimited case processing period would allow Division to violate plaintiffs' due process rights. On average, it takes Division more than seven years to fully process and (when necessary) adjudicate a claim. This kind of delay is clearly unreasonable. If HRL case processing guidelines are used as a benchmark to assess the reasonableness of Division's actions, the scope of the problem becomes clear. *Compare* (Tr. at 410 & 490) (explaining that probable cause

determinations take 21 months to 34 months) *with* (Tr. at 742–43) (noting that the statutory limit for the probable cause determination is 180 days). Division has offered no evidence showing that its expenditures would rise substantially if it took steps to improve its case processing time. The *Matthews* analysis, therefore, establishes that Division does not have sufficient interest in its current case processing procedures to defeat plaintiffs' claim of injury.

### b. Subclass C: Matthews Analysis

[19] The private interest injured by Division's ACD complainant contact procedures is the same interest at stake in Division's case processing regime: the interest in remedying and being free of discrimination. *See NOW v. Cuomo*, 14 F.Supp.2d at 433. Additionally, Plaintiff NOW showed that the current Division complainant contact procedures for persons facing an impending ACD put complainants at risk for erroneous dismissal of their claims. Plaintiff first showed that Division only makes two phone calls and sends two letters to notify a complainant that he is at risk for an ACD. Plaintiff also showed that 94% of Division's ACD determinations are made after one year. (PE 1, Exhibit "3" at 12–13). Plaintiff further presented the court with postal regulations showing that mail forwarding ceases after one year, (Plf. App. 1) (discussing Domestic Mail Manual Issue 34, 3/18/90) a fact which indicated that Division's mailings to persons whose files are more than one year old are likely ineffective. The court also recognizes that if Division knows a complainant's on file address is stale, and then attempts to contact complainant at the phone number on file for this address, then logically this phone number will most often be stale as well. Plaintiff NOW also showed that the ACD procedure erroneously deprived a large number of persons of their claims. NOW presented statistics showing that 4000 complaints were subjected to ACDs between October 1990 through fiscal year 1995–96, (PE 1), many of which were dismissed for "failure to locate" and "failure to cooperate."

Plaintiff offered a number of alternate procedures that could improve Division's ability to contact persons at risk for ACD. NOW argued that defendants could draft a clearer ACD letter, or return to Division's clearer pre–1991 ACD Letter. *Compare* (PE 7) (original clear letter) *to* (PE 8 & 15) (ambiguous ACD letters). Additionally, plaintiff argued that Division could use the Internal Revenue Service Mail Forwarding Service, or a people locator service, such as Auto Track (a service Division currently uses on other matters), to contact complainants. (Plf. Post Tr. Mem. of Law at 39 n. 23) (listing alternate contact procedures).

Division offered no evidence to show that the established ACD procedure serves the state's interests; indeed, Deputy Commissioner Lind made general, albeit temporary, improvements in Division's ACD procedures in light of the substantial evidence that the ACD process was unfairly depriving persons of their claims. Lastly, the court was not provided with any concrete evidence that the improvements plaintiff recommended for the ACD procedure would greatly increase Division's costs. The court, therefore, concludes that the balance of evidence favors plaintiff's claims, and that Division's ACD complainant contact procedures and its Post 1991 ACD letter violated subclass C's due process rights.

### C. EQUAL PROTECTION

Plaintiff subclasses A and B also claim that Division's case processing policies violated their right to equal protection because under these policies Division arbitrarily delayed processing certain complaints and subjected these complaints to the risk of erroneous dismissal and reduced damage awards.

Division's case processing policy is analyzed under the rational basis test. See *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). To withstand the test, the state's policy must be "rationally related to a legitimate state interest." *Myers v. County of Orange*, 157 F.3d 66, 74 (2d Cir.1998) (citations omitted). The policy "must be upheld against equal protection challenge if any reasonably conceivable state of facts could prove a rational basis for the classification." *FCC v. Beach Communications, Inc.*, 508 U.S.

313, 113 S.Ct. 2096. A policy will fail the test if "the varying treatment of different groups or persons [under the policy] is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [state's] action was irrational." *Barry v. Baruchi*, 443 U.S. 55, 65, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979).

 Under the HRL, Division's mission is to ensure that "every individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the state." 18 N.Y. Exec. L. § 290.3 The HRL also provides that Division must "inquire into incidents ... and conditions which may lead to tension and conflict among racial, religious and nationality groups, and to take such action ... as may be designed to alleviate such conditions ...." 18 N.Y. Exec. L. § 295.11 The processing policy complained of here is Division's policy of queuing claims based on: the illness of the complainant (Tr. at 277–78); the seriousness of the respondent's actions; and the fact that a claim has a short statute of limitations. (*id.*) When these criteria do not apply, Division processes earlier claims before more recently filed ones. (Tr. at 278). These indicia suggest that the Division is prioritizing claims which represent either a widespread or severe risk of injury to the public or complaints in which there is a risk that the complainant may die before the case is resolved.

Division's complaint queuing procedure, as presented, survives the rational basis test, as all it need do is "find some footing in the realities of the subject addressed by the law." *Beatie v. City of New York*, 123 F.3d 707, 712 (2d Cir.1997) (citations omitted). The policy takes a logical approach to achieving Division's goals: it prioritizes complaints with a

broader or more severe risk of injury for the public, and it offers special dispensation to persons with terminal illness. Plaintiffs' argument that the procedure fails to achieve its intended effect is immaterial. "We will not strike down a law as irrational simply because it may not succeed in bringing about the result it seeks to accomplish." *Id.*

### D. PRELIMINARY INJUNCTION

In *NOW I*, the court granted Plaintiff–NOW's request for a preliminary injunction enjoining Defendant Commissioner Mercado from implementing the 1995 Intake Rules because NOW established that it was likely to prevail on its claim that the rules violated NOW's members' due process rights by randomly barring complainants from filing claims with Division.[9] *See NOW I*, 182 F.R.D. at 42. Plaintiff now requests that the court convert the preliminary injunction into a permanent injunction and bar Defendant Mercado from resuming use of the rules.[10]

 When a plaintiff requests an injunction to remedy a constitutional violation, the court "first consider[s] whether plaintiff has established the fact of a violation[;]" if so, the next question is "whether the plaintiff has demonstrated both the presence of a continuing irreparable injury and the lack of an adequate remedy at law." *Farmland Dairies v. McGuire*, 789 F.Supp. 1243, 1249 (S.D.N.Y.1992) (Patterson, J.).

### 1. Proof of Constitutional Violation

 The evidence presented at the preliminary injunction hearing established that the 1995 Intake Rules violated NOW's members' due process rights. This evidence was as follows: (1) statutes which showed that Division is by law required to accept a complaint from "[a]ny person

9. The 1995 Intake Rules are 9 N.Y.C.R.R. §§ 465.1(1) & 465.3(c)(6). 9 N.Y.C.R.R. § 465.1(1) requires that complainant provide Division with "information sufficient to indicate that the [complainant] filing such verified document has been aggrieved by an unlawful discriminatory practice and has actual knowledge of the facts alleged." 9 N.Y.C.R.R. § 465.3(c)(6) provides that Division can reject a complaint when the intake worker believes the complaint is based on "mere speculation," "contradicts an inference

of discrimination" or is "unbelievable on its face."

10. The court will not address NOW's claim that the 1995 Intake Rules violated equal protection standards and its contention that the rules were promulgated in violation of the Supremacy Clause. *See Alexander v. Keane*, 991 F.Supp. 329, 338 (S.D.N.Y.1998) (Sotomayor, J.) (discussing the importance of judicial restraint).

claiming to be aggrieved by an unlawful discriminatory practice," 18 N.Y. Exec. L. § 297.1, and to investigate the claim to determine "whether there is probable cause to believe that the person named in the complaint ... has engaged or is engaged in an unlawful discriminatory practice." 18 N.Y. Exec. L. § 297.2a.; (2) evidence that prior to the 1995 Intake Rules, Division intake workers would accept any jurisdictionally correct and timely complaint submitted to Division, regardless of whether they were skeptical about the basis for the complaint (*Prelim. Inj. Tr.* at 315, 346); (3) proof that the 1995 Intake Rules, because of their ambiguous terms invited Division intake workers to speculate about the merits of potential claims; *see NOW I*, 182 F.R.D. at 40–41; (4) proof that under the 1995 Intake Rules workers turned away complaints based on their idiosyncratic opinions and speculations; *id;* (5) proof that ambiguities in the 1995 Intake Rules were never resolved in writing; *id.;* (6) evidence that workers received minimal training on how to implement the rules; *id.;* and (7) evidence that the training began months after officials began using the rules. *Id.* This evidence established that Division workers using these rules arbitrarily deprived persons of their property interest in their claims.

The evidence NOW presented at trial showed that the Intake Rules had great impact, and potentially deprived large numbers of persons of their discrimination complaints without cause. NOW presented trial evidence showing that 2,448 jurisdictionally correct and timely complaints were rejected under the 1995 Intake Rules, with no attempt being made to investigate these claims. (Tr. at 423–24). Additionally, NOW showed that Division turned away a substantial number of additional complaints for which they have no record. (Tr. at 981). If the court uses a conservative estimate, that 25% of the rejected claims were valid, it can reasonably be assumed that 625 more discrimination complaints would have been resolved under Division's original intake rules than were resolved under the 1995 Intake Rules.

Taken together, the facts presented at the preliminary injunction hearing and at trial establish that Division's 1995 Intake Rules, 9 N.Y.C.R.R. §§ 465.1(1) & 465.3(c)(6), deprived NOW members of their federally protected property interest in having their discrimination complaints resolved through Division procedures because these rules entirely prevented large numbers of complainants with valid claims from submitting claims to Division.

### 2. Proof of Continuing Harm

Defendant Mercado argues that plaintiff's petition for a permanent injunction is moot; he argues that NOW cannot show that the 1995 Intake Rules present a threat of "continuing irreparable injury" to its members because he has begun to repeal the rules. *Farmland Dairies v. McGuire*, 789 F.Supp. at 1249. The court recognizes that "the Eleventh Amendment bars a retrospective declaration of a violation of federal law where there is no continuing violation to enjoin." *Marbley v. Bane*, 57 F.3d 224, 232 (2d Cir.1995). However, "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case .... A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968) (citations omitted).

Based on these guidelines, the court concludes that plaintiff's request for an injunction is not moot. No evidence has been submitted to the court showing that the 1995 Intake Rules have been repealed. At the time of decision, the only evidence submitted on this issue was Deputy Commissioner Lind's testimony that Division was in the process of repealing the 1995 Intake Rules. (Tr. at 760). As of the date of judgment, it remained unclear whether the rules had been fully repealed. Therefore, the court cannot assume that plaintiff's claim for injunctive relief has been mooted.

Furthermore, even if the 1995 Intake Rules have been repealed, Division officials' behavior during the course of this lawsuit suggests that there is an impending threat that defendant Mercado or his successor might later reimplement the 1995 Intake Rules. *Green*, 474 U.S. at 73, 106 S.Ct. 423.

(explaining that a repealed law may be declared unconstitutional when defendant threatens to resume its use). The court takes note that defendant only voluntarily ceased using the 1995 Intake Rules after NOW amended its suit against Division to challenge the offending intake rules. The court also recognizes that defendant and other Division officials engaged in a pattern of unconstitutional conduct prior to this case, and therefore it is likely that, if an injunction is not issued, defendant or his successor will reimplement the 1995 Intake Rules, or some intake procedure functionally similar to them. *See United States v. Oregon State Med. Soc.,* 343 U.S. 326, 333, 72 S.Ct. 690, 96 L.Ed. 978 (1952). For these reasons, the court concludes that there is a continuing need for a permanent injunction.

### E. ABSOLUTE IMMUNITY

In their post-trial memorandum of law, for the first time, defendants Pataki and Cuomo raise the claim that they are entitled to absolute immunity from plaintiffs' claims; they argue that plaintiffs have improperly tried to sue defendants for their participation in protected legislative activities.

■ "Absolute immunity, because it detracts from section 1983's broadly remedial purpose, applies only to a limited class of officials and functions." *Spear v. Town of West Hartford,* 954 F.2d 63, 66 (2d Cir.1992). This kind of immunity fully protects officials from personal liability for the performance of certain discretionary acts. *Id.* Because absolute immunity offers officials such broad protection, courts typically limit its protections to legislators and prosecutors for the duties associated with their offices. *Id.* However, executive officials may qualify for its protections when they engage in prosecutorial and legislative kinds of duties. *Id.*

■ Defendants, however, have the burden of raising the absolute immunity defense in their initial and responsive pleadings, as it is an affirmative defense. *Cf. San Filippo v. United States Trust Co.,* 737 F.2d 246, 252 (2d Cir.1984). When they fail to do so, defendants waive their right to the

defense. Fed. R. Civ. Proc. 8(c) (discussing affirmative defenses).

Court records show that the first time defendants raised the absolute immunity defense was in Defendants' Post Trial Memorandum of Law. Also, defendants have failed to show that they raised the defense in their initial responses to plaintiff's various claims. Because the record does not support defendants' claim that they timely raised their absolute immunity defense, the court concludes that the defense is waived.

### F. APPROPRIATE RELIEF & FURTHER PROCEEDINGS

■ The district court has broad discretion to fashion equitable remedies for constitutional violations. *See Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1. 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). However, courts should refrain from fashioning relief that "intrude[s] unnecessarily on a state's governance of its own affairs," as the state has a strong need to maintain control over its fiscal operations. *Ass'n of Surrogates & Supreme Court Reporters Within New York v. New York,* 966 F.2d 75, 79 (2d Cir. 1992). The court may impose a remedial order on the state that has financial costs, so long as compliance with the order is not unduly burdensome or costly; *see Dean v. A. Coughlin,* 804 F.2d 207, 214–15 (2d Cir.1986), however, the prudent course is to allow a state to offer a remedial plan and improve upon it as necessary. *Id.*

■ Defendants are hereby enjoined from taking or continuing to take any action in violation of plaintiffs' Fourteenth Amendment due process rights. By way of remedy for the constitutional violations identified in this opinion, the court orders defendants to meet with plaintiffs and to forthwith commence formulation of a Joint Remedial Plan. Without intending to impinge upon the initial responsibility to formulate the plan, which predominately lies with Division officials, the court notes that the remedial plan, in order to address the constitutional violations identified in this opinion, must cover the areas proposed in this section, and include appropriate financial data as specified. The Remedial Plan must include:

–1–the projected staff and funding necessary for Division to process claims within 24 to 36 months, assuming Division receives a new case load of 5, 474 complaints each year;

–2–the projected staff and funding necessary for Division to permanently finance a special Backlog Case Unit that would automatically perform expedited case processing for all claims pending at Division for more than three years;

–3–proposed Division policies and programs that will ensure the integrity of plaintiffs' claims while they are pending at the Division. These policies may include programs designed to: timely depose complainants' witnesses and preserve their statements for the record; [including microfilming, recording, or warehousing complainants' documentary and testimonial evidence]; and more aggressively locate complainants' and witnesses' forwarding address information [including the use of a people locator service];

–4–proposed procedures that permit persons whose claims have been erroneously subject to ACD to appeal the ACD;

–5–anticipated funding sources that can be tapped to cover the costs of the aforementioned policy and staff changes.

The court recognizes that plaintiffs and defendants may fail to agree on certain aspects of the Joint Remedial Plan. Should this contingency occur, each side may submit individually proposed portions of the plan to the court.

In addition to their duty to participate in the formulation of the remedial plan, Division officials are enjoined from engaging in the following actions:

–1–implementing, 9 N.Y.C.R.R. §§ 465.1(1) and 465.3(c)(6), because these rules violate complainants' due process rights by barring them from submitting claims to Division;

–2–from singularly relying on United Postal Service mail forwarding procedures to locate complainants who face ACD determinations; defendants are required to use the Internal Revenue Service Mail Forwarding Service to locate persons whose claims are at risk for ACD, or an equivalent substitute;

–3–from using the Division ACD notification letter in circulation after April 11, 1991, because the letter provides insufficient notice to complainants that they are at risk for ACD; defendants must submit a new ACD notification letter for court review which unambiguously informs parties that their claims will be subject to ACD if they fail to respond to the letter, and that they have a right to appeal an ACD; defendants must also create a post-ACD determination letter informing complainants that their claims have NOW BEEN DISMISSED and notifying complainants of their right to appeal the ACD. The ACD notification letters should be mailed to an address for the complainant identified by the Internal Revenue Service Mail Forwarding Service;

–4–defendant Commissioner Mercado must vacate all cases dismissed under the failure to locate, and failure to cooperate ACD designations, and restore these complainants to the position they previously had in Division's adjudicatory process;

–5–Division must submit to the court the letter it will use to inform persons whose claims were dismissed under the ACD policy that they have the right to resubmit their claims.

Plaintiffs in subclass A with pending claims are entitled to the injunctive and declaratory relief provided above; Subclass A members with finally dismissed complaints may bring money damage claims against defendants. Plaintiffs' counsel must submit a methodology for identifying these plaintiffs. Plaintiffs in subclass C, because they are represented by NOW in this action, are entitled to declaratory and injunctive relief for the injuries caused by Division's ACD process.

The court retains jurisdiction to enforce, modify, or rescind the provisions of the aforementioned injunctions.

**IT IS SO ORDERED.**